**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3047
_____

NADINE PELLEGRINO;
HARRY WALDMAN,
                              Appellants

v.

UNITED STATES OF AMERICA TRANSPORTATION
SECURITY ADMINISTRATION, Div. of Dept. of
Homeland Security; TSA TSO NUYRIAH ABDUL-MALIK,
Sued in her individual capacity; TSA STSO LAURA
LABBEE, Sued in her individual capacity; TSA TSO
DENICE KISSINGER, Sued in her individual capacity;
JOHN/JANE DOE TSA Aviations Security Inspector
defendants sued in their individual capacities; JOHN/JANE
DOE TSA, Official Defendants, sued in their individual
capacities
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. Civ. No. 2-09-cv-05505)
District Judge:  Honorable J. Curtis Joyner
_____

Argued: October 3, 2017

Before:  AMBRO, KRAUSE and SCIRICA, *Circuit Judges*

(Opinion filed: July 11, 2018)

Nadine Pellegrino and Harry Waldman
Unit 1205 South
550 South Ocean Boulevard
Boca Raton, FL 33432

   *Pro Se Appellants*

Mark J. Sherer, Esq. (Argued)
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

   *Counsel for Appellees*

Paul M. Thompson, Esq. (Argued)
Sarah P. Hogarth, Esq.
McDermott Will & Emery
500 North Capitol Street, N.W.
Washington, DC 20001

Matthew L. Knowles, Esq.
McDermott Will & Emery
28 State Street
33rd Floor
Boston, MA 02109

   *Court Appointed Amicus Curiae*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge.*

In *Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017), we declined to imply a *Bivens* cause of action against airport screeners employed by the Transportation Security Administration (TSA) in part because they "typically are not law enforcement officers and do not act as such." *Id.* at 208. We now must decide a related question that we anticipated, but did not resolve, in *Vanderklok*: whether TSA screeners are "investigative or law enforcement officers" under the Federal Tort Claims Act (FTCA).

This question, one of first impression among the Courts of Appeals, arises because Appellant Nadine Pellegrino has asserted intentional tort claims against TSA screeners. Although under the FTCA the United States generally enjoys sovereign immunity for intentional torts committed by federal employees, this rule is subject to an exception known as the "law enforcement proviso," which waives immunity for a subset of intentional torts committed by employees who qualify as "investigative or law enforcement officers." 28 U.S.C. § 2680(h). Pellegrino's claims may proceed only if TSA screeners fall into this category.

Based on our review of the statute's text, purpose, and legislative history, as well as precedent from this Court and other Courts of Appeals, we now reach the conclusion that we foreshadowed in *Vanderklok* and hold that TSA screeners are not "investigative or law enforcement officers" under the law

3

enforcement proviso. Pellegrino's claims are therefore barred by the Government's sovereign immunity, and we will affirm the District Court's judgment dismissing this action.

## I.      Facts and Procedural History

### A.      Airport Security and Screeners

To place what follows in proper context, we briefly describe the structure of the TSA and the screeners' place within that structure. Congress created the TSA in the aftermath of the terrorist attacks of September 11, 2001, with the enactment of the Aviation and Transportation Security Act (ATSA), Pub. L. No. 107-71, 115 Stat. 597 (2001). The head of the TSA is the Under Secretary of Transportation for Security, 49 U.S.C. § 114(b), who is responsible for security in all modes of transportation, including civil aviation, *id.* § 114(d).

Pertinent here is the Under Secretary's responsibility to "provide for the screening of all passengers and property, including United States mail, cargo, carry-on and checked baggage, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation." *Id.* § 44901(a). With exceptions not relevant here, this screening is required to be performed "by a Federal Government employee." *Id.* These employees were referred to as "screeners" at the time of the ATSA's enactment but were reclassified as "Transportation Security Officers" (TSOs) in 2005 as part of an effort to improve morale and combat employee-retention problems. *The Transportation Security Administration's Airline Passenger and Baggage Screening: Hearing Before the S. Comm. on Commerce, Sci., & Transp.*,

4

109th Cong. 7 (2006) [hereinafter *Screening Hearing*] (statement of Edmund "Kip" Hawley, Assistant Secretary, Transportation Security Administration).[1] In 2016, the TSA screened more than 2 million passengers per day. *See* Bob Burns, *TSA Year in Review*, Transp. Sec. Admin. (Jan. 12, 2017), https://www.tsa.gov/blog/2017/01/12/tsa-year-review-record-amount-firearms-discovered-2016.

TSOs form just one part of the airport-security apparatus. The Under Secretary may also designate employees to serve as "law enforcement officer[s]." 49 U.S.C. § 114(p)(1). An employee so designated may carry a firearm, make arrests, and seek and execute warrants for arrest or seizure of evidence. *Id.* § 114(p)(2). The Under Secretary is required to deploy law enforcement personnel at each screening location; typically, at least one such law enforcement officer must be at each location. *Id.* § 44901(h)(1)–(2). Screening locations are thus staffed by both TSOs and law enforcement officers.

## B.    Factual Background[2]

In 2006, Pellegrino and her husband, Harry Waldman, arrived at the Philadelphia International Airport, where they planned to catch a flight home to Florida. Pellegrino brought

---

[1] Throughout this opinion, we will use the terms "TSO" and "TSA screener" without distinction.

[2] Because the District Court granted summary judgment in the defendants' favor, we view the facts in the light most favorable to Pellegrino. *See, e.g.*, *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 210 n.1 (3d Cir. 2017).

three bags to the security checkpoint: a rolling tote, a larger rolling bag that would fit in the overhead compartment of the airplane, and a small black canvas bag. After Pellegrino passed through a metal detector, a TSO directed her to step aside for further screening. A few minutes later, TSO Thomas Clemmons arrived and began to search Pellegrino's bags, but because Pellegrino believed that Clemmons was treating neither her nor her bags respectfully, she asked for a private screening. According to Pellegrino, Clemmons then "walked off with a very arrogant, negative, hostile attitude," Pellegrino Dep. 85:24–86:2, D.Ct. Dkt. No. 156, and TSO Nuyriah Abdul-Malik came to perform the screening in Clemmons's stead.

As Abdul-Malik prepared to search Pellegrino's bags, Pellegrino "had the distinct feeling" that Abdul-Malik's gloves were not clean and asked her to put on new ones. Pellegrino Dep. 90:18–22, D.Ct. Dkt. No. 156. Abdul-Malik did as Pellegrino asked, but Pellegrino asserts that this request engendered hostility from Abdul-Malik. Abdul-Malik and Pellegrino then proceeded to a private screening room, where they were joined by TSA employees Laura Labbee, a supervisory TSO, and Denise Kissinger, another TSO.[3] Kissinger swabbed Pellegrino's shirt and left the room to test the sample (for the presence of explosives), while Abdul-Malik inspected Pellegrino's luggage. Pellegrino contends that Abdul-Malik's screening was unnecessarily rough and

---

[3] Labbee was a supervisor, but because no party has claimed that her duties were materially different from those of Abdul-Malik or Kissinger, we will not distinguish among their positions.

6

invasive—extending to her credit cards, coins, cell phone, and lipstick.

At some point, Pellegrino asked Labbee why she was being subjected to this screening, and Labbee responded that it was an "airline-designated search." Pellegrino Dep. 104:12, D.Ct. Dkt. No. 156. Pellegrino took this to mean that her airline ticket had been marked in a way that prompted the search, and because she and Waldman had accidentally switched tickets, she sought to stop the search by explaining that she believed that Waldman should have been searched instead. Nevertheless, the search continued, and Pellegrino told Labbee that she was going to report her to TSA authorities.

Once Abdul-Malik finished searching the rolling tote, Pellegrino, who believed that Abdul-Malik had damaged her eyeglasses and jewelry, asked Abdul-Malik to leave her items outside the tote so that Pellegrino could re-pack it herself. Abdul-Malik refused and the interaction continued to deteriorate. First, Abdul-Malik had trouble zipping the tote closed and had to press her knee into it to force it shut. Next, when Pellegrino asked Labbee for permission to examine the tote, which she believed Abdul-Malik had damaged, that request was also denied. Pellegrino then told Labbee and Abdul-Malik they were "behaving like bitches." Pellegrino Dep. 114:13–14, D.Ct. Dkt. No. 156. Finally, after Abdul-Malik had searched Pellegrino's largest bag, which contained clothes and shoes, and Kissinger finished swabbing and testing, Pellegrino was told that she could leave.

But simple closure was not to be. Instead, Pellegrino saw that Abdul-Malik had not re-packed her shoes, asked if she intended to do so, and was told "no." Pellegrino Dep. 122:2, D.Ct. Dkt. No. 156. At that point, intending to re-pack her bags

7

outside of the screening room, Pellegrino tossed her shoes through the open door toward the screening lanes and began to carry her largest bag out of the room. In the process, according to Labbee and Kissinger, she struck Labbee in the stomach with the bottom of the bag. When Pellegrino then returned to the screening room for her smaller rolling tote, Abdul-Malik allegedly stood in her way, forcing her to crawl on the floor under a table to retrieve it. According to the TSOs, Pellegrino then struck Abdul-Malik in the leg with this bag as she was removing it. Although Pellegrino denied (and has consistently denied) that either bag touched either TSO, Labbee and Abdul-Malik immediately went to the supervisor's station to press charges against Pellegrino.

Philadelphia police officers arrived at the scene a short time later, arrested Pellegrino, and took her to the police station, where she was held for about 18 hours before being released on bond. Eventually, the Philadelphia District Attorney's Office filed ten charges against Pellegrino: two counts each of felony aggravated assault, *see* 18 Pa. Cons. Stat. § 2702; possession of instruments of a crime, *see id.* § 907; reckless endangerment, *see id.* § 2705; simple assault, *see id.* § 2701; and making terroristic threats, *see id.* § 2706.

By the time the matter proceeded to trial in Philadelphia Municipal Court, however, Abdul-Malik was no longer employed by the TSA and did not appear. And because the trial judge had ruled that no witnesses could testify about events that took place outside of the private screening room in the absence of footage from video surveillance, Labbee—who was positioned partially outside the door of the screening room during the alleged assault—was precluded from testifying to those events. Without that testimony, the trial judge entered a verdict of not guilty.

8

In July 2008, Pellegrino submitted a claim to the TSA concerning the TSOs' alleged misconduct and requesting damages of $951,200. The TSA denied the claim by letter almost a year later.

## C.    Procedural Background

In November 2009, Pellegrino and Waldman[4] commenced this civil rights action in the Eastern District of Pennsylvania, naming as defendants the United States, the TSA, Abdul-Malik, Labbee, and Kissinger, and raising FTCA claims as to all defendants for (a) property damage, (b) false arrest/false imprisonment, (c) malicious prosecution, (d) civil conspiracy, (e) defamation, and (f) intentional and negligent infliction of emotional distress. In addition, as to the individual defendants, they raised *Bivens* claims for malicious and retaliatory prosecution, "aiding and abetting" malicious prosecution, and conspiracy to deprive civil rights, as well as a conspiracy claim under 42 U.S.C. § 1985(3). As to the TSA alone, they raised claims for failing to investigate their civil rights complaint in violation of the Administrative Procedure Act (APA) and failing to comply with requests for information under the Freedom of Information Act (FOIA) and the Privacy Act.

---

[4] The District Court dismissed Waldman's claims, primarily for lack of standing. While both Pellegrino's and Waldman's names appear on Appellants' briefs, they have not challenged the District Court's dismissal of Waldman from this action. We therefore will treat Pellegrino as the sole appellant.

9

In a series of orders, the District Court denied relief to Pellegrino on all claims with the exception of one FTCA property damage claim that the parties settled. In this appeal, we focus primarily on Pellegrino's FTCA claims for the intentional torts of false arrest, false imprisonment, and malicious prosecution.[5]

The District Court granted summary judgment on those claims on the ground that TSA screeners are not covered by the FTCA's law enforcement proviso because they are not "empowered by law to execute searches . . . for violations of Federal law." *Pellegrino v. U.S. Transp. Sec. Admin.*, No. 09-5505, 2014 WL 1489939, at *5, *8 (E.D. Pa. Apr. 16, 2014). While the Court recognized that TSA screeners are permitted to perform something that qualifies as a "search" under the Fourth Amendment, it concluded that it was unclear whether "Congress intended 'search' in § 2680(h) to be synonymous with 'search' within the meaning of the Fourth Amendment." *Id.* at *5. Because it found the language of the proviso ambiguous, the Court turned to legislative history. The Court observed that "[a] review of the legislative history reveals that Congress, in response to 'no-knock' raids conducted by federal narcotic agents on the wrong dwellings, passed the 1974 amendment to the Federal Tort Claims Act to provide compensation for such victims." *Id.* at *6 (quoting *Solomon v.*

---

[5] At the motion-to-dismiss stage, the District Court first found that the individual defendants and the TSA were not proper defendants and dismissed all claims against them, substituting the United States as the sole defendant. *See* 28 U.S.C. § 2679. The Court then permitted the false arrest, false imprisonment, and malicious prosecution claims to proceed against the United States.

*United States*, 559 F.2d 309, 310 (5th Cir. 1977) (per curiam)). As "the law enforcement proviso was enacted as a response to specific eg[]regious behavior during raids conducted by federal law enforcement officers," the Court concluded it "was not intended to be expansive enough to cover airport security screeners." *Id.* at *7.

The District Court also ruled in the Government's favor on Pellegrino's remaining claims, and Pellegrino then filed this appeal.[6]

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction over this action pursuant to 28 U.S.C. §§ 1346(b) and 1331. *See S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 331–32 (3d Cir. 2012); *Egervary v. Young*, 366 F.3d 238, 245 (3d Cir. 2004). We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's interpretation of the FTCA. *See Baer v. United States*, 722 F.3d 168, 172 (3d Cir. 2013).

---

[6] After the parties submitted their initial briefs, the Court appointed Paul M. Thompson of McDermott Will & Emery to serve as amicus curiae on behalf of Pellegrino, and Amicus and the Government have filed supplemental briefs addressing the issues presented in this case. We express our gratitude to Mr. Thompson for accepting this matter pro bono and for the quality of his briefing and argument in this case. Lawyers who act pro bono fulfill the highest service that members of the bar can offer to the legal profession.

11

## III. Legal Background

### A. The Federal Tort Claims Act

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA creates a layered scheme waiving and then reasserting immunity. At the first level, the FTCA waives sovereign immunity for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1).[7] However, that broad waiver is limited by a number of exceptions, which we have construed as akin to affirmative defenses. *See Abunabba*, 676 F.3d at 333 n.2. As relevant here, the "intentional tort exception"[8] preserves the Government's immunity for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). Finally, the FTCA includes an exception

---

[7] Prior to the 1946 passage of the FTCA, individuals could obtain compensation for negligent acts committed by federal employees through only a private bill in Congress. The FTCA was designed to replace that "notoriously clumsy" system. *Dalehite v. United States*, 346 U.S. 15, 25 (1953).

[8] This label is somewhat imprecise because § 2680(h) "does not remove from the FTCA's waiver all intentional torts, *e.g.*, conversion and trespass, and it encompasses certain torts, *e.g.*, misrepresentation, that may arise out of negligent conduct." *Levin v. United States*, 568 U.S. 503, 507 n.1 (2013).

to that exception—the "law enforcement proviso"—which waives immunity for certain intentional torts committed by "investigative or law enforcement officers." *Id.* That proviso is at issue in this case.

Read together, these subsections provide that while private citizens are barred from bringing suit against federal employees for many intentional torts, they may nonetheless bring suit for a subset of these torts—"assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution"—if the alleged act was committed by an "investigative or law enforcement officer." *Id.* The law enforcement proviso defines "investigative or law enforcement officer" to "mean[] any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.*

Because Pellegrino asserts intentional tort claims arising out of the actions of TSOs, we must determine as a matter of statutory interpretation whether TSOs qualify as "investigative or law enforcement officers" such that the claims fall within the proviso.

## B. *Vanderklok v. United States*

Contrary to the Government's assertion, we did not resolve this issue in its favor in our recent decision in *Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017). But that case does provide some important touchpoints for assessing the question now squarely before us.

In *Vanderklok*, the plaintiff brought various claims against a TSO, including claims under the FTCA and a claim under *Bivens* for retaliatory prosecution in violation of the First

13

Amendment. *Id.* at 195. The District Court denied the TSO's qualified immunity defense to the *Bivens* claim, and the TSO appealed. *Id.* at 196. We reversed the District Court's order in part, concluding that a *Bivens* cause of action for First Amendment retaliatory prosecution was not available to the plaintiff in those circumstances. *Id.* at 209.

In evaluating whether it was permissible to imply this *Bivens* claim, we considered two questions: (1) whether an alternative process—namely, an FTCA claim—was available to protect the constitutional interests at stake; and (2) whether there were special factors counseling against implying a *Bivens* cause of action in this context. *See id.* at 200. In addressing the first of these issues, we noted both the District Court's conclusion "that [the TSO] was not an investigative or law enforcement agent because he was not an 'officer' of the United States under [the FTCA's] definition" and its reasoning that the FTCA distinguished between "employee[s]" and "officer[s]," with only the latter being used in the law enforcement proviso. *Id.* at 203. The District Court also observed that the ATSA, "which created the TSA[,] designates as 'law enforcement personnel' only those TSA agents who are '(1) authorized to carry and use firearms; (2) vested with the degree of the police power; and (3) identifiable by appropriate indicia of authority.'" *Id.* (alteration omitted) (quoting 49 U.S.C. § 44903(a)(1)–(3)). Because the TSO was not "law enforcement personnel" under that definition, the District Court determined he was an employee, not an officer, and therefore was not subject to the law enforcement proviso. *See id.*

Although we recounted this reasoning, we were careful to emphasize that "[t]he District Court's decision about the applicability of the law enforcement proviso is not on appeal at

14

this time" and that our focus was on the availability of a *Bivens* action. *Id.* We then concluded that, even without an alternative process (an FTCA claim) available to the plaintiff, we would not imply a *Bivens* claim because special factors unique to the airport-security context counseled heavily against doing so. We identified several such factors: (a) TSA agents are part of the country's national-security apparatus; (b) Congress is in a better position than the Court to recognize a new species of liability; and (c) TSA agents are not typically law enforcement officers. *Id.* at 206–08. In discussing point (c), we referred back to our discussion of the FTCA claim and emphasized the highly circumscribed and administrative nature of the TSO role:

> TSA employees typically are not law enforcement officers and do not act as such. As previously discussed, only those TSA employees specifically designated by the Under Secretary with the responsibilities of an officer, in accordance with 49 U.S.C. § 44903(a), operate like police officers. As a result, line TSA employees are not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers. *See* 49 C.F.R. § 1542.213 (delineating mandatory training). Instead, they are instructed to carry out administrative searches and contact local law enforcement if they encounter situations requiring action beyond their limited though important responsibilities. *Cf.* 49 C.F.R. § 1542.215 (providing for "[u]niformed law enforcement personnel in the number and manner adequate to

15

support" passenger screenings). Since a First Amendment retaliatory prosecution claim hinges, in part, on whether the allegedly offending government employee had probable cause to take some enforcement action, a *Bivens* claim is poorly suited to address wrongs by line TSA employees.

*Vanderklok*, 868 F.3d at 208–09 (citation omitted).[9]

This ruling was one of the "portions of the opinion necessary to th[e] result," and thus not dictum. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996); *see also In re Friedman's Inc.*, 738 F.3d 547, 552 (3d Cir. 2013) (explaining that a statement is not dictum if it is "necessary to our ultimate holding"). However, we ruled in *Vanderklok* only that TSOs are not law enforcement officers for purposes of a *Bivens* claim. Thus, while there may be good reasons to interpret the law enforcement proviso consistently with our *Bivens* case law,

---

[9] "Administrative searches" are an exception to the general rule that a search or seizure is unreasonable in the absence of individualized suspicion. *See United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir. 2006). "Suspicionless checkpoint searches" are one such example, and "are permissible under the Fourth Amendment when a court finds a favorable balance between 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Id.* at 178–79 (quoting *Illinois v. Lidster*, 540 U.S. 419, 427 (2004)). In *Hartwell*, we concluded that TSA screenings fall into this category and constitute permissible administrative searches. *See id.* at 181.

16

we agree with Amicus that *Vanderklok* addressed a different category of claim and is not dispositive of the question presented today.

## IV. Analysis of Intentional Tort FTCA Claims and the Law Enforcement Proviso

In support of their respective positions on whether TSOs qualify as "investigative or law enforcement officers," the parties offer very different interpretations of § 2680(h)'s law enforcement proviso.

Amicus contends that because the screenings performed by TSOs qualify as "searches" under the Fourth Amendment, *see George v. Rehiel*, 738 F.3d 562, 577 (3d Cir. 2013), TSOs "execute searches" for purposes of the proviso. Moreover, Amicus argues, the definition's reference to "any" officer shows that Congress intended for the term to be construed broadly and that "officer" itself has a broad, elastic definition. *See* Amicus Br. at 22 (stating that "officer" is defined as "[o]ne who is charged by a superior power (and particularly by government) with the power and duty of exercising certain functions" (alteration in original) (quoting Black's Law Dictionary (4th ed. 1968))). Amicus relies, at bottom, on the following syllogism: (a) federal workers who are authorized to perform *any* type of search are "investigative or law enforcement officers"; (b) TSA screeners perform searches; *ergo* (c) TSA screeners are "investigative or law enforcement officers."

The Government, meanwhile, argues that the law enforcement proviso is designed to cover only *traditional* investigative or law enforcement officers, i.e., those who possess criminal justice powers. The Government contends

17

that TSA screeners have much more circumscribed powers—as opposed to, for instance, FBI or DEA agents—and therefore are not covered by the proviso. The Government also argues that TSOs are "employees," not "officers," and that the limited administrative searches that they perform do not constitute "searches" under the proviso.

We agree with the Government. Based on the proviso's text, structure, context, purpose, and history, as well as the relevant case law, we are persuaded that the phrase "investigative or law enforcement officers" is limited in scope and refers only to officers with criminal law enforcement powers. Because TSOs only conduct administrative searches and do not have such powers, they are not subject to the law enforcement proviso, and the Government's sovereign immunity bars this action.

### A. Interpretation of the Law Enforcement Proviso

#### 1. Text

As in all cases in which we interpret a statute, to determine the scope of the phrase "investigative or law enforcement officer"—meaning "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law"—under § 2680(h), "we look first to its language, giving the words used their ordinary meaning," *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). In addition to the statutory language at issue, we consider "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997);

18

*see also Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) (explaining that courts must "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose'" (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013))).[10]   With these considerations in mind, we conclude that the law enforcement proviso covers only criminal law enforcement officers.

To start, we find it important that the FTCA repeatedly distinguishes between *officers* and *employees*.  The FTCA waives sovereign immunity for certain acts and omissions of an "employee."  28 U.S.C. § 1346(b)(1); *see also id.* § 2671 ("'Employee of the government' includes (1) officers or employees of any federal agency . . . ."); *id.* § 2680(a) (discretionary-function exception referring to "an employee"). However, the law enforcement proviso refers not to "employees," but to "investigative or law enforcement *officers*." *Id.* § 2680(h) (emphasis added).  The proviso again uses that term in defining "investigative or law enforcement officers" to mean any "officer" with the powers specified.  *Id.* Given that Congress used the word "officer" rather than "employee" in the proviso, we are reluctant to interpret "officer" in a way that would conflate those terms.  *See*

---

[10] *See also United States v. Thornhill*, 759 F.3d 299, 308 (3d Cir. 2014) ("In matters of statutory interpretation, the plain meaning of statutory language is often illuminated by considering not only the particular statutory language at issue, but also the structure of the section in which the key language is found, and the design of the statute as a whole and its object." (alterations omitted) (quoting *United States v. Tupone*, 442 F.3d 145, 151 (3d Cir. 2006))).

*generally Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (referring to "the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended" (citation omitted)). This militates against Amicus's interpretation of this term, which is materially indistinguishable from the word "employee."[11]

We find additional support in the canon *noscitur a sociis*, which "implements the idea that the meaning of a word should be determined by considering the words with which it is associated in context." *Flores v. Att'y Gen.*, 856 F.3d 280, 295 n.80 (3d Cir. 2017). Each of the powers listed in the law enforcement proviso—"to execute searches, to seize evidence, or to make arrests for violations of Federal law"—has criminal law connotations. *See, e.g.*, *Hernandez v. United States*, 34 F. Supp. 3d 1168, 1179 (D. Colo. 2014) ("Each of these functions are commonly understood to be traditional law enforcement functions."). For instance, "execute a search" is a phrase

---

[11] The dissent suggests that we render the remainder of the law enforcement proviso a nullity by interpreting "investigative or law enforcement officer" to refer to criminal law enforcement officers. To the contrary, our reading is the one that gives meaning to both components of Congress's definition of "investigative or law enforcement officer": a person who is designated an "officer" and who performs traditional criminal law enforcement functions. In any event, it is not unusual for Congress to define "law enforcement officer" by reference to the officer's duties, even if those duties all sound in criminal law. *See, e.g.*, 5 U.S.C. § 8331(20); 12 U.S.C. § 248(q)(4); 18 U.S.C. § 245(c); 18 U.S.C. § 1515(a)(4).

typically used when a warrant is involved, *see, e.g.*, 18 U.S.C. § 3109 (explaining when an officer may break a door or window in order "to execute a search warrant"), and Congress generally does not use this phrase when granting employees the power to perform administrative searches, *see, e.g.*, 29 U.S.C. § 657(a)(2) (providing that Occupational Safety and Health Administration (OSHA) inspectors may "inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein"). The other powers—"to seize evidence" and, especially, "to make arrests for violations of Federal law"—also sound in criminal law. *See, e.g.*, *Arizona v. Hicks*, 480 U.S. 321, 326 (1987) ("It is well established that under certain circumstances the police may *seize evidence* in plain view without a warrant[.]" (emphasis added) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971))). Each of these phrases helps give meaning to the others, reinforcing that the phrase "to execute searches" refers to the power to search based on individualized suspicion, not merely to conduct an administrative search, and that the term "investigative or law enforcement officer" therefore means those officers who perform criminal law enforcement functions.[12]

---

[12] Our dissenting colleague contends there is no need to resort to canons of statutory construction because the text of the proviso is plain and unambiguous. Would it were so. Instead, our respective reasonable but divergent interpretations, as well as the split among the district courts that

21

It is also significant that the law enforcement proviso covers just a subset of the torts listed in the intentional tort exception. While the intentional tort exception preserves immunity for the torts of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, and interference with

---

have considered the matter, *see infra* note 25, attest to its ambiguity. The dissent also posits specifically that the *noscitur a sociis* canon is inapplicable because the statute is phrased in the disjunctive, but even in that context, as the Supreme Court observed in *Jarecki v. G.D. Searle & Co.*, this canon is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." 367 U.S. 303, 307 (1961). There, considering the phrase "exploration, discovery, or prospecting," the Court concluded that because "[t]he three words in conjunction . . . all describe income-producing activity in the oil and gas and mining industries," "'discovery' . . . means only the discovery of mineral resources." *Id.* at 305, 307. And because those terms shared a "core of meaning," providing "a clue that it was those industries Congress had in mind when it drafted the provision," the Court found *noscitur a sociis* "illuminating." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 289 n.7 (2010) (discussing *Jarecki*). Such is also the case here, where there is ambiguity as to whether those who conduct TSA screenings are "officer[s] . . . empowered by law to execute searches," 28 U.S.C. § 2680(h), and where interpreting that phrase to include such administrative searches risks giving "unintended breadth" to the law enforcement proviso, *Jarecki*, 367 U.S. at 307.

22

contract rights, the law enforcement proviso waives immunity for only half of these—assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution. *See* 28 U.S.C. § 2680(h). In other words, the law enforcement proviso waives immunity for the types of tort claims typically asserted against criminal law enforcement officers, while preserving immunity for other tort claims that are asserted more broadly against federal employees. This further supports our conclusion that the law enforcement proviso is designed to cover only criminal law enforcement officers.

Our textual analysis is further buttressed by the fact that the words to be defined here—"investigative or law enforcement officer"—typically refer to criminal law enforcement. *See generally United States v. Stevens*, 559 U.S. 460, 474 (2010) ("[A]n unclear definitional phrase may take meaning from the term to be defined."). We have identified only one other context in which Congress has used the phrase "investigative or law enforcement officer." That is the context of criminal wiretapping and electronic tracking: The phrase is repeated throughout Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *see* 18 U.S.C. §§ 2510–2522, and the Electronic Communications Privacy Act of 1986 (ECPA), which amended Title III and added new provisions governing "pen registers and trap and trace devices," *see* 18 U.S.C. §§ 3121–3127.[13] Title III provides standards for when

---

[13] In addition, 50 U.S.C. §§ 1809 and 1827 criminalize unauthorized engagement in or disclosure of information from electronic surveillance or physical searches under color of law, but carve out an affirmative defense where the defendant is "a law enforcement or investigative officer" who engaged in the

"investigative or law enforcement officers" may intercept and use private communications, *see generally Gelbard v. United States*, 408 U.S. 41, 46 (1972), and the ECPA does the same for the use of pen registers and trap and trace devices. These statutes concern the acquisition of evidence for purposes of *criminal* law investigations, as Title III's definition of "investigative or law enforcement officer" makes clear: "'Investigative or law enforcement officer' means any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses." 18 U.S.C. § 2510(7).[14]

---

surveillance in the course of his official duties and pursuant to a warrant or court order. 50 U.S.C. §§ 1809(b), 1827(b).

[14] In the Title III context, the Office of Legal Counsel (OLC) has determined that the powers of an "investigative . . . officer" are not coextensive with those of a "law enforcement officer" but that both terms carry criminal law connotations. To determine whether DOJ agents are "investigative or law enforcement officers" per 18 U.S.C. § 2510(7), as required for them to access communications intercepted under the statute, the OLC noted that "the definition is phrased throughout in the disjunctive—investigative *or* law enforcement officer, empowered to conduct investigations *or* to make arrests." 14 Op. O.L.C. 107, 108 (1990). Based on this disjunctive, the OLC reasoned that "it seems plain that Congress intended the term 'investigative officers' to be broad enough to include officials who participate in investigations but do not have arrest authority." *Id.* In the same breath, however, the OLC

Likewise, while Congress has used the phrase "law enforcement officer" much more frequently, the term invariably refers to individuals who are involved in *criminal* law enforcement. *See, e.g.*, 12 U.S.C. § 248(q)(4) (defining "law enforcement officers" for purposes of section authorizing the Board of Governors of the Federal Reserve System to designate personnel to protect bank premises, carry firearms, and make arrests); 18 U.S.C. § 115(c)(1) (defining "[f]ederal law enforcement officer" for purposes of statute criminalizing efforts to impede, intimidate, or interfere with officials, judges, and law enforcement officers); 18 U.S.C. § 1515(a)(4) (defining "law enforcement officer" for purposes of witness-tampering statute). We have not found any instance in which this term covers an individual who performs only administrative duties.[15]

While none of these various textual arguments is, standing alone, dispositive, each points toward the same conclusion: The law enforcement proviso covers only officers who are engaged in criminal law enforcement.

---

emphasized the criminal law enforcement functions of the investigative officers in question, stating that "the only discussion in the legislative history of the term 'investigative officers' indicates that the term encompasses *all officers* who carry out *any law enforcement duties relating to offenses* enumerated in [18 U.S.C. §] 2516." *Id.* (emphasis added).

[15] While we acknowledge, of course, that these words do not necessarily hold the same meaning across statutes, the regularity with which these words are used in the criminal law context does bear on their meaning here.

25

### 2. Purpose

Our reading is also supported by our understanding of Congress's purpose in enacting the law enforcement proviso. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute . . . ."); *see also King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) (adopting the interpretation of a statute that "can fairly be read consistent with what we see as Congress's plan").

Critically, interpreting "officer" to have a criminal law component avoids an unprincipled expansion of the Government's waiver of sovereign immunity. Countless federal employees are empowered to perform "searches." The Secretary of Commerce, for instance, may "make such inspection of the books, records, and other writings and premises and property of any person" whose activities relate to weather modification, 15 U.S.C. § 330c(a); FDA inspectors may make "examination and inspection of all meat food products prepared for commerce in any slaughtering, meat-canning, salting, packing, rendering, or similar establishment" and "shall have access at all times, by day or night, whether the establishment be operated or not, to every part of said establishment," 21 U.S.C. § 606(a); and EPA employees may enter establishments where hazardous wastes "have been generated, stored, treated, disposed of, or transported from" and "inspect and obtain samples" of any such wastes, 42 U.S.C. § 6927(a).[16] Drug tests also constitute searches under

---

[16] *See also* 21 U.S.C. § 880 (authorizing entry of premises and inspection of finished and unfinished drugs, chemicals, and other substances and materials); 42 U.S.C.

26

the Fourth Amendment.  *See, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616–17 (1989).  In short, reading the proviso to include administrative searches would sweep into its ambit large swaths of the federal workforce, producing an unprecedented expansion of the United States' tort liability. While Amicus expressly argued that these types of employees should be covered by the law enforcement proviso, *see* Corrected Tr. of Oral Arg. at 8:3–9:10, we will not impute to Congress so significant a waiver of sovereign immunity without far more explicit evidence of its intent, *see King*, 135 S. Ct. at 2494 (rejecting a proposed interpretation of a statutory scheme because "[i]t is implausible that Congress meant the Act to operate in this manner").

### 3.    Legislative History

Legislative history cannot overcome the clear language of a statute, but it can "play a confirmatory role in resolving ambiguity when statutory language and structure support a given interpretation."  *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 621–22 (3d Cir. 2015); *see also Catwell v. Att'y Gen.*, 623 F.3d 199, 208 (3d Cir. 2010).  Here, the legislative history of the law enforcement proviso confirms our interpretation of the text.

---

§ 263b(g) (authorizing entry and inspection of mammography facilities); 42 U.S.C. § 5413 (authorizing entry and inspection of factories and warehouses where manufactured homes are manufactured, stored, or held for sale); 42 U.S.C. § 7414(a)(2) (authorizing entry and inspection of premises of any person who owns or operates an emission source).

Of particular note, Congress contemporaneously considered three bills to amend the broad immunity preserved by the intentional tort exception—S. 2558, 93d Cong. (1973); H.R. 8245, 93d Cong. (1973); and H.R. 10439, 93d Cong. (1973)—with Members referring regularly to the other bills as each was debated.  Two of the bills (S. 2558 and H.R. 10439) waived sovereign immunity for the specified intentional torts for *all* federal employees.  Only one—H.R. 8245—limited the waiver of immunity to "investigative or law enforcement officers."  H.R. 8245 was the bill eventually signed into law, codifying the law enforcement proviso in its present form.  *See* Act of March 16, 1974, Pub. L. No. 93-253, 88 Stat. 50 (codified at 28 U.S.C. § 2680(h)).  *See generally* John C. Boger et al., *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis*, 54 N.C. L. Rev. 497, 510–17 (1976).

Three other aspects of the legislative history also reflect Congress's intention to limit the proviso to criminal law enforcement officers.  First, Congress was spurred to action by two ill-conceived raids conducted by federal narcotics agents in Collinsville, Illinois.  In these raids, the agents, acting without warrants, kicked in doors without warning, drew weapons, and terrorized the residents, only to determine later that they had entered the wrong houses.  As one committee report stressed, "[t]here is no effective legal remedy against the Federal Government for the actual physical damage, mu[ch] less the pain, suffering and humiliation to which the Collinsville families have been subjected."  S. Rep. No. 93-588, at 2 (1973), *as reprinted in* 1974 U.S.C.C.A.N. 2789, 2790.  Members of Congress returned again and again to the problem of these "no knock" raids and the need to create a meaningful remedy for the victims.  *See, e.g.*, 120 Cong. Rec.

5287 (1974) (statement of Rep. Wiggins) ("I believe the Members ought to realize that this Senate amendment was an emotional response to the unfortunate Collinsville case . . . ."). Thus, the driving concern behind the enactment of H.R. 8245 was the potential for abuse of the devastating powers wielded by criminal law enforcement.

Second, Members of Congress explicitly discussed the fact that H.R. 8245, unlike the other bills, would not cover federal employees who perform administrative searches. Some observed that H.R. 8245 "only applies to law enforcement officers. It does not apply to any other Federal employees that might violate the rights of an individual." 120 Cong. Rec. 5287 (statements of Reps. Donohue and Wiggins). Others, urging passage of the bills that waived immunity for all federal employees, lamented that H.R. 8245, by limiting the waiver to "investigative or law enforcement officers," would provide no remedy for assaults committed by those who perform only administrative searches:

> I can give you an illustration. We have Department of Agriculture investigators who go into look at books and records. We have Defense Department auditors to look at books and records. I can see where we can get in a dispute where records should be shown or not shown and a report shown by mistake and the contractor takes it away and says you shouldn't have seen that and some sort of assault occurs. The assault may not be intentionally inflicted to create any more damage than to keep him away. He may trip over backward and hit his head and fracture his skull and even die. They are not law

29

enforcement officers even under this definition. They don't qualify.

*Federal Tort Claims Amendments: Hearings on H.R. 10439 Before the Subcomm. on Claims and Governmental Relations of the H. Comm. on the Judiciary*, 93d Cong. 18 (1974) [hereinafter *H.R. 10439 Hearings*] (statement of Irving Jaffe, Acting Assistant Att'y Gen.); *see also id.* at 15 (statement of Jaffe) ("It should be noted that . . . H.R. 8245 is confined in its applicability to Federal investigative or law enforcement officers, while . . . H.R. 10439 would waive the sovereign immunity of the United States as to the same acts or omissions on the part of all Government employees.").

Third, when the drafters selected for the proviso what they characterized as "the types of tort[s] most frequently arising out of activities of Federal law enforcement officers,"[17] they selected those torts (assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution) typically claimed against traditional law enforcement officers performing criminal law functions.

The criminal law boundaries of the law enforcement proviso are also reinforced by the legislative history of a related statutory provision that incorporates the proviso: 31 U.S.C. § 3724. That section authorizes the Attorney General to settle, for up to $50,000, claims brought specifically against an "investigative or law enforcement officer as defined in [the law

_____

[17] *H.R. 10439 Hearings* at 14 (statement of Jaffe); *see also* 119 Cong. Rec. 33,496 (1973) (giving verbatim explanation in reference to S. 2558).

enforcement proviso of] section 2680(h) . . . who is employed by the Department of Justice acting within the scope of employment." 31 U.S.C. § 3724(a).[18] As originally drafted, § 3724 was written to cover the settlement of claims arising from the actions of "any officer *or employee* of the Federal Bureau of Investigation or other law enforcement component of the Department of Justice." H.R. Rep. No. 101-46, at 7–8 (1989) (emphasis added). But Brent Hatch, Deputy Assistant Attorney General of the DOJ Civil Division, testified that this language was "too vague," as it might then apply to "the litigating arms of the Antitrust Division or of the Civil Rights Division, for example," whose functions "are aimed at the enforcement of the law." *Id.* at 8. According to Hatch, "the intent of the bill is narrower" and thus would be better captured by the FTCA language allowing compensation for certain injuries caused by "investigative or law enforcement officers." *Id.* Congress proceeded to adopt this construction.[19]

---

[18] An almost identical, subsequently enacted provision permits the Treasury Secretary to settle claims for damage or loss caused by "an investigative or law enforcement officer . . . who is employed by the Customs Service and acting within the scope of his or her employment." 19 U.S.C. § 1630.

[19] The dissent discounts the corroborative value of § 3724's legislative history because it reflects that personnel such as "a DEA Agent, . . . a Border Patrolman, or a Deputy Marshal" who also perform administrative searches are not insulated from the proviso's scope. Dissent at 45 (quoting H.R. Rep. No. 101-46, at 7). However, the fact that traditional criminal law enforcement officers may *also* have occasion to perform administrative searches does not alter the fact that they

31

In sum, the legislative history of the proviso, as well as § 3724, fortifies our conclusion that Congress was focused on violations caused during criminal law enforcement activities and intentionally designed a remedy for those violations.

### 4.    Case Law

Our interpretation of the law enforcement proviso is also consistent with our case law and that of other Courts of Appeals.

In *Matsko v. United States*, 372 F.3d 556 (3d Cir. 2004), for example, we categorically excluded classes of employees from the law enforcement proviso.  There, the plaintiff filed an FTCA action concerning injuries he sustained when a Mine Safety and Health Administration (MSHA) inspector slammed his face into a briefcase lying on a desk and asserted that "his claim fit[] within the FTCA's special treatment of assaults by investigative or law enforcement officers." *Id.* at 560.  We first observed that the law enforcement proviso did not apply because the mine inspector did not commit the torts in the course of executing a search, seizure, or arrest, as we previously required under *Pooler v. United States*, 787 F.2d 868, 872 (3d Cir. 1986).  But we went on to explain that, even if *Pooler* was incorrectly decided, the mine inspector was not an "investigative or law enforcement officer" for the independent reason that "employees of administrative agencies, no matter what investigative conduct they are

---

are empowered to conduct criminal law enforcement functions and in no way casts doubt on the textual and historical reasons to believe that § 2680(h) and § 3724 exclude from their reach those who perform *only* administrative searches.

32

involved in, do not come within the § 2680(h) exception." *Matsko*, 372 F.3d at 560. In support of this conclusion, we cited *EEOC v. First National Bank of Jackson*, 614 F.2d 1004, 1007–08 (5th Cir. 1980), in which, we explained, the Fifth Circuit had refused "to apply the exception to an Equal Employment Opportunity Commission agent," *Matsko*, 372 F.3d at 560.

*Matsko* remains the law of this Circuit[20] and reflects the line we have drawn, in construing the law enforcement proviso, between administrative personnel performing solely administrative functions and those—whether employed by an administrative agency or a law enforcement agency— expressly designated law enforcement officers or assigned law enforcement duties. Indeed, the MSHA inspector in *Matsko* had "authority to inspect mines and investigate possible violations," *id.*, just as the EEOC agent in *First National Bank of Jackson* had "access to, for the purpose of examination, and

---

[20] In *Millbrook v. United States*, 569 U.S. 50 (2013), the Supreme Court abrogated *Pooler*, holding that the torts covered by the proviso were not restricted to those committed during the course of a search, seizure, or arrest. *Id.* at 57. The Government there conceded that the named federal officers constituted "investigative or law enforcement officers," *id.* at 55 n.3, so the question before the Court was *when* a tort committed by such an officer would fall within the proviso and the Court did not have occasion to address *who* meets the definition of an "investigative or law enforcement officer," *see id. Millbrook* thus does nothing to disturb our conclusion in *Matsko* that employees of administrative agencies do not meet that definition.

33

the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices," 614 F.2d at 1007–08 (citation omitted). Those employees were authorized to conduct administrative searches, but because their jobs did not include criminal law enforcement responsibilities, they were considered to fall outside the law enforcement proviso.[21]

That approach is also consistent with decisions of other Courts of Appeals, which have treated only those performing criminal law enforcement duties as "investigative or law enforcement officers" under the proviso. For example, the D.C. Circuit has concluded that postal inspectors, who are empowered to investigate criminal matters, *see* 18 U.S.C. § 3061, are covered by the proviso. *See Moore v. United States*, 213 F.3d 705, 708 (D.C. Cir. 2000). Courts have also ruled that the proviso covers customs officers, *see Nurse v. United States*, 226 F.3d 996, 1002–03 (9th Cir. 2000), Veterans' Administration (VA) police officers, *see Celestine v. United States*, 841 F.2d 851, 852–53 (8th Cir. 1988) (per curiam), U.S. Marshals, *see Hoston v. Silbert*, 681 F.2d 876,

---

[21] As discussed in more detail below, in *Vanderklok*, we reiterated this distinction, relying on the ATSA's separate designation of "employees" and "law enforcement officers" to conclude that "TSA employees typically are not law enforcement officers and do not act as such." 868 F.3d at 208. Although we were assessing there only whether TSOs were law enforcement officers for purposes of *Bivens* claims, we expressly recognized the cabined authority of TSOs, in contrast with the more expansive powers of law enforcement officers. *See id.* at 208–09.

34

879 (D.C. Cir. 1982) (per curiam), Immigration and Naturalization Service (INS) agents, *see Caban v. United States*, 671 F.2d 1230, 1234 (2d Cir. 1982), FBI agents, *see Brown v. United States*, 653 F.2d 196, 198 (5th Cir. 1981), and federal correctional officers, *see Hernandez v. Lattimore*, 612 F.2d 61, 64 n.7 (2d Cir. 1979).  Each of those individuals participates in criminal law enforcement.[22]

Likewise, in *Bunch v. United States*, the Seventh Circuit recently held that there were genuine disputes of material fact as to whether a Bureau of Alcohol, Tobacco, and Firearms (ATF) forensic chemist fell within the proviso precisely because the forensic chemist may have been an "ATF officer" authorized to participate in criminal investigations under 18 U.S.C. § 846 and its implementing regulations, and his job duties appeared to "include[] the identification of relevant evidence for colleagues during crime-scene investigations." 880 F.3d 938, 943, 945 (7th Cir. 2018).  To be sure, that court rejected the notion that "executing searches" is limited to executing search warrants, *id.* at 945, and highlighted that the

---

[22] While INS agents have some civil responsibilities, they are also empowered "to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens."  8 U.S.C. § 1357(a)(4); *cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1212–13 (2018) (plurality opinion) (explaining that removal proceedings in some ways resemble criminal actions); *Mateo v. Att'y Gen.*, 870 F.3d 228, 232 (3d Cir. 2017) (same).  Likewise, Bureau of Prisons officers are entitled to carry firearms and make arrests for violations of federal law, *see* 18 U.S.C. § 3050, as are customs officers, *see* 19 U.S.C. § 1589a.

proviso applies to both "investigative *and* law-enforcement officers" who execute searches, *id.* at 944. But it relied on the fact that ATF officers are authorized under Title 18—the federal criminal code—"to inspect the site of any accident, or fire, in which there is reason to believe that explosive materials were involved," *id.* at 943 (quoting 18 U.S.C. § 846 (1994)), and it offered, as examples of the types of searches covered by the proviso, searches incident to arrest, protective sweeps, and searches conducted pursuant to the automobile exception, *id.* at 945—i.e., searches conducted by criminal law enforcement officers.

On the other hand, the Courts of Appeals have held that the proviso does not cover positions that lack a criminal law component. In *First National Bank of Jackson*, for example, the Fifth Circuit refused to apply the proviso to EEOC agents, explicitly distinguishing between federal employees who "have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices," and "investigative or law enforcement officers" who have the power to "execute searches." 614 F.2d at 1007–08 (citation omitted). Similarly, in *Wilson v. United States*, the Second Circuit held that parole officers do not qualify. 959 F.2d 12, 15 (2d Cir. 1992) (per curiam). While acknowledging that parole officers have limited authority to seize evidence, the court determined that because that power "depends on the consent of the person from whom the evidence is to be taken, however, parole officers lack the seizure power contemplated by section 2680(h), and thus cannot be considered law enforcement personnel." *Id.* The Courts of Appeals have also concluded that the law enforcement proviso does not cover federal prosecutors, *see Moore*, 213 F.3d at 710, security

36

guards, *see Solomon*, 559 F.2d at 310, or doctors at a VA hospital, *see Johnson v. United States*, 547 F.2d 688, 691 (D.C. Cir. 1976) (per curiam).  In short, consistent with *Matsko*, our Sister Circuits have consistently interpreted the proviso to include federal officers who are involved in criminal law enforcement and to exclude federal employees who are not.[23]

\* \* \*

Based on these various indicia of meaning—the law enforcement proviso's text, structure, context, purpose, and history, as well as relevant case law—we are persuaded that the phrase "investigative or law enforcement officers" refers only to *criminal* law enforcement officers, not to federal employees who conduct only administrative searches.

---

[23] *Sami v. United States*, 617 F.2d 755 (D.C. Cir. 1979), *abrogated on other grounds by Sosa*, 542 U.S. 692, is not to the contrary.  In that case, the D.C. Circuit was asked to determine whether the Chief of the United States National Central Bureau was covered by the law enforcement proviso notwithstanding the fact that his "present duties d[id] not involve frontline law enforcement work." *Id.* at 764.  He was, the court concluded, because his position was unquestionably that of a *criminal* law enforcement officer: He was classified as a "criminal investigator[]" and the Government had stipulated that he served in a position that could be staffed by only "trained law enforcement personnel." *Id.*

## B.    The Proviso's Application to TSA Screeners

Given our holding as to the scope of the proviso, we have little difficulty concluding it does not cover TSA screeners. No Court of Appeals has yet decided the question precedentially,[24] and district courts have reached different conclusions.[25]    However, as indicated in *Vanderklok*, confirmed in the ATSA (the TSA's founding statute), and demonstrated in practice, TSA screeners conduct only administrative searches, are not criminal law enforcement officers, and thus do not qualify as "investigative or law enforcement officers" under the FTCA.

As a starting point, we draw valuable guidance from *Vanderklok*. As we explained there, "TSA employees typically are not law enforcement officers and do not act as such." *Vanderklok*, 868 F.3d at 208. Underpinning that rationale was

---

[24] *See Corbett v. Transp. Sec. Admin.*, 568 F. App'x 690, 701 (11th Cir. 2014) (per curiam) (holding that the law enforcement proviso does not cover TSA screeners). Pursuant to 11th Cir. R. 36-2, unpublished opinions of the Eleventh Circuit "may be cited as persuasive authority."

[25] *Compare, e.g.*, *Hernandez*, 34 F. Supp. 3d at 1182 (holding that the proviso does not cover TSA screeners), *Weinraub v. United States*, 927 F. Supp. 2d 258, 266 (E.D.N.C. 2012) (same), *and Coulter v. U.S. Dep't of Homeland Sec.*, No. 07-4894, 2008 WL 4416454, at *9 (D.N.J. Sept. 24, 2008) (same), *with Armato v. Doe 1*, No. CV-11-02462-PHX-ROS, 2012 WL 13027047, at *4 (D. Ariz. May 15, 2012) (holding that the proviso covers TSA screeners).

our prior case law upholding TSA screenings as permissible suspicionless checkpoint searches under the administrative search doctrine. *See George*, 738 F.3d at 577; *United States v. Hartwell*, 436 F.3d 174, 178–81 (3d Cir. 2006). Against that backdrop, we explained that TSA screeners have limited authority: "[T]hey are instructed to carry out administrative searches and contact local law enforcement if they encounter situations requiring action beyond their limited though important responsibilities." *Vanderklok*, 868 F.3d at 209.

Reinforcing the distinction we recognized in *Vanderklok*, the ATSA frequently distinguishes between "employees" who conduct administrative searches and "law enforcement officers." For example, it specifies that the "screening[s]" conducted by TSOs "shall be carried out by a Federal Government employee (as defined in section 2105 of title 5, United States Code)." 49 U.S.C. § 44901(a).[26] This is

---

[26] We recognize that 5 U.S.C. § 2105 defines "employee" to cover both an "officer" and an individual who has been appointed to civil service in a certain specified manner. However, to be an "officer," the individual must be "required by law to be appointed in the civil service by . . . the head of an Executive agency." *Id.* § 2104(a)(1). As the parties agreed at oral argument, TSA screeners are not appointed by the head of an executive agency and are therefore not "officers" under Title 5's definition. *See* Corrected Tr. of Oral Arg. at 23:3–4. While the dissent correctly points out that § 2104 is underinclusive in that a few categories of "investigative or law enforcement officers" traditionally covered by the proviso are not appointed by the head of an executive agency, we cannot agree that we should therefore disregard the statutory

39

in contrast to 49 U.S.C. § 114(p), which permits the TSA administrator to designate particular TSA employees as "law enforcement officer[s]" empowered to "carry a firearm," "make an arrest," and "seek and execute warrants for arrest or seizure of evidence," functions that squarely place them within the law enforcement proviso.[27]    Those law enforcement

definition of "officer" or the distinction Congress has drawn between "officers" and "employees."  We hew more closely to Congress's intention by acknowledging its definition and including a small number of additional traditional criminal law enforcement officers within the proviso than by setting that definition aside entirely.

[27] Although § 114(p) is phrased in the conjunctive while the proviso is phrased in the disjunctive, § 114(p) remains instructive in determining who constitutes a "law enforcement officer" under the proviso because it reflects Congress's own distinction between TSA screeners and "law enforcement officer[s]" in Title 49, which tracks its distinction between "employees" and "officers" in the FTCA.

Other analogous statutes, such as that governing Postal Inspectors, likewise preserve the text-based distinction between regular employees and officers by separately denominating the law enforcement arm of the agency.  *See, e.g.*, 18 U.S.C. § 3061(a) (discussing "Postal Inspectors and other agents of the United States Postal Service designated by the Board of Governors to investigate criminal matters").  We note too that Congress has expressly provided that certain employees qualify as "investigative or law enforcement officers" where their classification as such might otherwise be uncertain, such as personnel designated by the Secretary of the

officers are required to be stationed throughout airports to support TSOs and fulfill precisely those functions that TSOs have neither the authority nor the expertise to fulfill. *See id.* § 44901(h); 49 C.F.R. § 1542.215. Such distinctions between TSOs and law enforcement officers recur throughout the statute. *Compare* 49 U.S.C. § 114(e)(2) (providing that the Under Secretary is responsible for "hiring and retention of security screening personnel"), *id.* § 44901(a) (explaining that screenings will be performed by an "employee")*, id.* § 44935(e)–(f) (describing training programs, hiring qualifications, and employment standards for "[s]ecurity screeners")*, and id.* § 44936(a) (requiring background investigation of a "security screener")*, with id.* § 114(p) (describing "law enforcement officer[s]")*, id.* § 44901(h)(1) (requiring the deployment of "law enforcement personnel" at screening locations), *id.* § 44903(a) (defining "law enforcement personnel"), *and id.* § 44922 (permitting the Under Secretary to deputize "State and local law enforcement officers").

Despite this clear statutory distinction, Amicus argues that TSOs must qualify as "law enforcement officers" because of their title—they are "transportation security *officers*"—and because they wear a badge that labels them as "officers." We are not persuaded that the word "officer" has this talismanic property, and it would be surprising indeed if such a superficial

Interior and the Secretary of Commerce to enforce federal laws relating to fish and wildlife, who qualify as "investigative or law enforcement officers" for FTCA purposes under the express terms of their authorizing statute. *See* 16 U.S.C. § 742*l*(b). Congress made no such provision in the ATSA for TSA screeners.

41

gloss were sufficient to trigger a waiver of federal sovereign immunity. There are many jobs that have the word "officer" in the title, such as "chief executive officer" or "title officer," but they unquestionably are not "investigative or law enforcement officer" positions. On the other hand, other jobs, like "special agent" or "postal inspector," do not have the word "officer" in the title, but they nonetheless qualify as "investigative or law enforcement officer" positions. Indeed, Amicus's argument, if anything, cuts the other way, for as we noted previously, TSOs were originally called "screeners," and their title was changed in 2005 merely as part of an effort to improve employee incentives and "upward mobility opportunities within [the] profession."[28] Specifically, it appears that the title change and related adjustments were intended to "give TSOs an opportunity to . . . apply for DHS *law enforcement positions*"—further undermining the notion that TSOs already constitute a species of law enforcement officer. U.S. Gov't Accountability Office, GAO-07-299, *Aviation Security* 56 (2007) (emphasis added). Thus, neither the TSO title nor the badge (which TSOs apparently began wearing two years after the conduct at issue in this case, *see* Press Release, Transp. Sec. Admin., *supra* note 28) speaks to

---

[28] *Screening Hearing* at 7 (statement of Edmund "Kip" Hawley, Assistant Secretary, Transportation Security Administration); *see* Press Release, Transp. Sec. Admin., *Transportation Security Officers Have Renewed Focus and New Look on Seventh Anniversary of 9/11* (Sept. 11, 2008), https://www.tsa.gov/news/releases/2008/09/11/transportation-security-officers-have-renewed-focus-and-new-look-seventh.

the nature of the position or the scope of the accompanying authority.

The statutory distinction between TSOs and law enforcement officers is also meaningful as a matter of practice, as demonstrated by TSA Management Directive No. 100.4 (Sept. 1, 2009), filed by Pellegrino, entitled "Transportation Security Searches." That directive separately defines "law enforcement officer," "TSA law enforcement officer," and "transportation security officer," and it stresses the limits of the authority of a "transportation security officer": TSOs may not perform screenings for the purpose of "detect[ing] evidence of crimes unrelated to transportation security." *Id.* ¶¶ 4, 6.A(4). If a TSO does discover such evidence, he or she is required to alert a supervisor or a law enforcement official. The TSO can "request[]" the individual to wait for law enforcement to arrive, but the individual is nevertheless "free to leave the checkpoint once applicable screening requirements have been completed successfully." *Id.* ¶ 6.A(4). By contrast, "TSA law enforcement officers," and only "TSA law enforcement officers," may engage in law enforcement activities, including investigations, detentions, and searches that "are not limited to administrative or special needs searches." *Id.* ¶ 6.D.

Recognizing that TSA screeners conduct administrative, not criminal searches thus not only respects the distinction Congress has made between "employees" and "law enforcement officers" in the FTCA, it also reflects the different job responsibilities and training of TSA "screeners" and "law enforcement officers" prescribed by the ATSA and agency policy. As we explained in *Vanderklok*, unlike criminal law enforcement officers, "line TSA employees are not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers."

43

868 F.3d at 208. Put differently, TSOs, like most administrative employees, do not receive training on the specific constitutional doctrines and legal standards relevant to assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution—the torts covered by the law enforcement proviso. And that follows logically from the fact that doctrines like probable cause, as we described in *Vanderklok*, while of central importance to criminal law enforcement officers, are largely irrelevant to a TSO's job. Acknowledging that TSOs are not law enforcement officers under the proviso has the added value of maintaining this practical coherence.

Although all of these indicators—our case law, the TSA's governing statute, and agency policy and practice—confirm that TSOs conduct only routine administrative searches, the dissent argues that TSA screenings constitute "searches for violations of federal law because they are directed to illegal and prohibited items on passenger aircraft." Dissent at 13. But the fact that screenings are searches for prohibited items only points up why they are not searches "for violations of federal law": Screenings are aimed at items that must be removed before boarding—not at particular individuals—and their purpose is "an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings," *United States v. Aukai*, 497 F.3d 955, 960 (9th Cir. 2007) (en banc) (quoting *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973))—not to gather evidence of a crime with an eye toward

44

criminal prosecution.[29]  Although a screening might prompt a TSO to refer an individual to criminal authorities for such investigation and prosecution where that administrative search happens to turn up evidence of a crime, screenings themselves are not conducted for that purpose and we could not have upheld them in *Hartwell* under the administrative search doctrine as suspicionless checkpoint searches if they were.  *See City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000) ("We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing."); *see also Florida v. Harris*, 568 U.S. 237, 243 (2013) (explaining that a police officer must have probable cause to conduct a search for "contraband or evidence of a crime").

Nor are we persuaded that airport screenings are so distinct from other administrative searches that they should be treated differently under the proviso.  The dissenting opinion

---

[29] Moreover, most of the prohibited items for which TSOs search are perfectly legal to possess in other contexts.  *See What Can I Bring?*, Transp. Sec. Admin., https://www.tsa.gov/travel/security-screening/whatcanibring/all (last visited July 6, 2018).  Thus, if an individual is found with a prohibited item, the TSA can impose only civil penalties: "Criminal penalties and fines are different and wholly separate from the civil penalties assessed by TSA," and "[r]eferral for criminal investigation and enforcement is appropriate where there appears to be a violation of criminal laws." *Enforcement Sanction Guidance Policy*, Transp. Sec. Admin., https://www.tsa.gov/sites/default/files/enforcement_sanction_guidance_policy.pdf (last visited July 6, 2018); *see also* 49 C.F.R. § 1503.401.

contends that because TSA screeners are uniquely empowered by 49 U.S.C. § 44901(g)(5) to conduct "a physical search together with manifest verification," the searches they conduct, unlike most administrative searches, are indistinguishable from *Terry* stops conducted by traditional criminal law enforcement officers. That offers a basis, according to the dissent, to bring TSA screeners within the proviso without sweeping in all other employees who conduct administrative searches.

The problem with this approach is that it mistakes the subject matter of § 44901(g)(5) and is inconsistent with our precedent. For its part, § 44901(g)(5) does not authorize TSOs to conduct physical searches of passengers. Instead, that provision exclusively addresses searches of cargo. *See* 49 U.S.C. § 44901(g)(1). And while a TSO's "[s]creening of individuals and property" can include "the inspection of individuals, accessible property, checked baggage, and cargo," 49 C.F.R. § 1546.207(a), a pat-down conducted as part of a screening is not analogous to a *Terry* stop. *Terry* stops require reasonable, articulable suspicion, *see Terry v. Ohio*, 392 U.S. 1, 30 (1968), and are directed to specific individuals; TSA screenings are not. As we observed in the analogous context of border searches, "patdowns, frisks, [and] luggage searches" in connection with screenings for entry are "routine" and "involv[e] neither a high expectation of privacy nor a seriously invasive search." *United States v. Whitted*, 541 F.3d 480, 485–86 (3d Cir. 2008). And as we explained in *Hartwell*—specifically addressing TSA screenings—such screenings are required of "every air passenger" and are "minimally intrusive," "public," and "well-tailored to protect personal privacy." 436 F.3d at 180. These screenings, we emphasized, "escalat[e] in invasiveness only after a lower level of screening

46

disclose[s] a reason to conduct a more probing search," so that even screenings that escalate to a pat-down may be properly categorized by their character at the outset as a "single search under the administrative search doctrine." *Id.* at 178, 180. In view of this precedent, categorizing passenger screenings up to and including pat-downs as routine administrative searches, the dissent's logic could not be cabined to TSA screeners, but instead would extend inexorably to all federal employees who perform administrative searches.[30]

In sum, as the delineated duties of TSOs make clear, and as is the case with many federal agencies, there is a clear division between the criminal law enforcement and non-criminal law enforcement arms of the TSA. TSOs—like meat inspectors, OSHA workers, and other personnel who are permitted to perform only administrative searches—fall into the latter category and thus do not qualify as "investigative or law enforcement officers" under the law enforcement proviso of the FTCA. Because the proviso does not apply, Pellegrino's intentional tort claims are barred by § 2680(h)'s intentional tort

---

[30] Even the dissent seems to acknowledge as much when it posits that "'search' in § 2680(h) is synonymous with the term 'search' as used in the Fourth Amendment," Dissent at 16, and derives from general dictionary definitions that "any officer of the United States" must mean anyone "charged with administering and maintaining the law" or "appointed or elected to serve in a position of trust, authority, or command," Dissent at 25–26 (quoting *Officer*, Webster's Third New International Dictionary (1971)).

47

exception, and the District Court correctly dismissed those claims based on the United States' sovereign immunity.[31]

\* \* \*

We recognize that our holding here, combined with our decision in *Vanderklok*, means that individuals harmed by the intentional torts of TSOs will have very limited legal redress.[32]

---

[31] Typically, we construe a waiver of sovereign immunity strictly and "in favor of the sovereign." *Lightfoot v. United States*, 564 F.3d 625, 628 (3d Cir. 2009). We are mindful that the Supreme Court has directed courts not to apply this general rule in interpreting exceptions to the waiver of immunity. *See, e.g.*, *Dolan*, 546 U.S. at 492. Here, however, we are dealing with an exception to an exception, which arguably supports reverting to the general rule of strict construction. *See Foster v. United States*, 522 F.3d 1071, 1079 (9th Cir. 2008) (applying this analysis). To the extent *Dolan* does apply to an exception to an exception, it directs us "to identify 'those circumstances which are within the words and reason of the exception'—no less and no more." 546 U.S. at 492 (quoting *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984)). It does not, as the dissent asserts, suggest that the language should be interpreted against the Government. In any event, we need not and do not here decide whether to construe the language in favor of the Government; we merely flag this issue as a reminder of the significant interests involved when the federal treasury is at stake.

[32] Counsel for the Government asserted at oral argument that the United States could, in appropriate cases, refuse to insulate a TSO from liability by declining to certify under the

48

And we are sympathetic to the concerns this may raise as a matter of policy, particularly given the nature and frequency of TSOs' contact with the flying public. For most people, TSA screenings are an unavoidable feature of flying, 49 U.S.C. § 44901(a), and they may involve thorough searches of not only the belongings of passengers but also their physical persons—searches that are even more rigorous and intimate for individuals who happen to be selected for physical pat-downs after passing through a metal detector or imaging scanner. For these reasons, Congress may well see fit to expand the proviso or otherwise legislate recourse for passengers who seek to assert intentional tort claims against TSOs. But such policy judgments, particularly as they relate to sovereign immunity and the public fisc, fall squarely in the realm of the legislative branch. Because Congress to date has limited the proviso to "investigative or law enforcement officers" and TSOs do not meet that definition, we will affirm the dismissal of Pellegrino's FTCA claims.

## V.     Analysis of Other Claims

We will also affirm the District Court's judgment as to Pellegrino's remaining claims. As for her other FTCA claims, "[t]he Federal Tort Claims Act [] bars actions against the United States for . . . defamation," *Brumfield v. Sanders*, 232 F.3d 376, 382 (3d Cir. 2000), and Pennsylvania law forecloses the rest, *see Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA

---

Westfall Act that the TSO was acting within the scope of her employment. *See* Corrected Tr. of Oral Arg. at 30:6–12; *see also* 28 U.S.C. § 2679(d)(1), (2); *Osborn v. Haley*, 549 U.S. 225, 229–30 (2007).

is generally determined by reference to state law."). That is because, under Pennsylvania law, "recovery for the tort of intentional infliction of emotional distress [has been] reserved by the courts for only the most clearly desperate and ultra extreme conduct," *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998), and a claim for negligent infliction of emotional distress is restricted to four scenarios, *see Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008), none of which is present here.[33]

Nor did the District Court err in rejecting Pellegrino's *Bivens* claims of retaliatory prosecution under the First Amendment and malicious prosecution under the Fourth Amendment.[34] *Vanderklok* itself forecloses the retaliatory prosecution claim, *see* 868 F.3d at 209, and the same "special factors" that we observed there counseled against implying a *Bivens* claim—that TSA screeners are part of the national-

---

[33] These factual scenarios are as follows: "(1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative." *Toney*, 961 A.2d at 197–98.

[34] We do not address the second issue that we asked Amicus to brief—whether the FTCA's judgment bar precludes these *Bivens* claims—because the parties agree that it has since been resolved by the Supreme Court, which has ruled that the bar does not apply in these circumstances. *See Simmons v. Himmelreich*, 136 S. Ct. 1843, 1847–48 (2016).

security system and protect the public safety, Congress should be the body to recognize new causes of action, and TSA screeners are not trained on the issues of probable cause that serve as the foundation of a retaliatory prosecution claim, *id.* at 206–09—apply with equal force to Pellegrino's claim of malicious prosecution, *see, e.g.*, *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) (explaining that a malicious prosecution claim requires showing that prosecution was initiated without probable cause).[35]

Pellegrino's FOIA claims also fail. In response to Pellegrino's FOIA request,[36] the TSA identified 375 pages of responsive documents, and withheld 90 of them, primarily on the ground that they were privileged and thus subject to Exemption 5 of FOIA. *See* 5 U.S.C. § 552(b)(5); *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). We perceive no error in the District Court's conclusion that the TSA conducted an adequate search and that

---

[35] This also disposes of Pellegrino's *Bivens* conspiracy and aiding-and-abetting claims. *See Black v. Montgomery County*, 835 F.3d 358, 372 n.14 (3d Cir. 2016) ("Because the District Court reasoned that [the appellant] could not succeed on her underlying Fourth Amendment malicious prosecution or Fourteenth Amendment due process claims, it correctly determined that she could not succeed on her conspiracy claims.").

[36] Pellegrino requested copies of "all records, reports, follow-up requests, etc., from any TSA office containing her name, Nadine Pellegrino Waldman[,] that was initiated by any TSA officer, official, investigator, or personnel." Gary Decl. ¶ 4, D.Ct. Dkt. No. 232; *see* 5 U.S.C. § 552(a)(3)(A).

the documents it withheld were indeed exempt from production. The TSA's declaration attested to extensive searches, confirmed by the production of hundreds of responsive documents. And the District Court conducted an *in camera* review of the documents withheld and made its own finding that they fell within FOIA's exemption. Pellegrino has identified no basis to disturb those rulings.

We are also unpersuaded that the District Court abused its discretion with respect to any of the case management orders challenged by Pellegrino. It was under no obligation to give Pellegrino an additional extension of time to file still more material when it had already granted her an extension of time to file her motion for reconsideration and response to the Government's motion for reconsideration, and Pellegrino had then filed a motion spanning hundreds of pages. Nor did it err in denying Pellegrino leave to amend her complaint yet again when the case had been ongoing for two years and Pellegrino had already amended three times. *See generally Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666–67 (7th Cir. 2007).

As for the sealing orders, the documents subject to the first sealing order were filed under seal as Pellegrino requested, and the Court reasonably refused to issue a second sealing order to permit Pellegrino to file previously available evidence in support of her motion for reconsideration. *See, e.g.*, *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). And while Pellegrino argues that she needed to depose additional witnesses who were not made available to her, she has not established that this limitation prejudiced her in any way. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 281 (3d Cir. 2010) (explaining that a

discovery order will not be disturbed "absent a showing of actual and substantial prejudice").[37]

In sum, the District Court dedicated an enormous amount of time and care to this case and its rulings were well within the broad scope of its discretion.

## VI. Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[37] To the extent that Pellegrino challenges the District Court's disposition of her claims under 42 U.S.C. § 1985(3), the APA, or the Privacy Act, we have reviewed the District Court's analysis and discern no error.

Nadine Pellegrino, et al. v. TSA, et al.
No. 15-3047

_____

AMBRO, <u>Circuit Judge</u>, dissenting

The Federal Government is typically immune from suit. The Federal Tort Claims Act, 28 U.S.C. § 1346(b), waives the Government's immunity for certain torts committed by Government employees. 28 U.S.C. § 2680(h) does so for specific intentional torts committed by "investigative or law enforcement officers," which it defines as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

Nadine Pellegrino relies on § 2680(h) to recover against Transportation Security Officers ("TSOs") who, she alleges, detained her, damaged her property, and fabricated charges against her. Pellegrino contends TSOs fit fully within its purview because they are legally empowered to conduct searches of all passengers and property before boarding commercial flights originating in the United States. Consequently, she argues her intentional-tort claims should proceed to trial.

Although there is scant textual basis for denying Pellegrino's claims, my colleagues hold that TSOs are immune from suit because they deem § 2680(h)'s waiver of immunity to include only criminal law enforcement officers. They equate airport screenings with routine administrative inspections, even though the former involve rigorous and thorough searches that often extend to an individual's physical person. Their opinion leaves several plaintiffs without a remedy, even if a TSO assaults them, wrongfully detains them, or fabricates criminal charges against them. I

1

do not believe this is what Congress intended when it drafted § 2680(h) or pertinent Transportation Security Administration ("TSA") statutes.

While I agree with my colleagues' reasoning on other points, I do not agree that § 2680(h) solely refers to criminal law enforcement officers. Instead, it applies to "any officer" who has legal authority to "execute searches . . . for violations of Federal law." TSOs may by law execute searches, as they must screen "all passengers and property, including United States mail, cargo, carry-on and checked baggage, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation." 49 U.S.C. § 44901(a). The statute and its implementing regulations further define screening to include "a *physical search* together with manifest verification," *id.* § 44901(g)(5) (emphasis added), and "the inspection of individuals, accessible property, checked baggage, and cargo," 49 C.F.R. § 1546.207(a). Hence TSOs are covered by § 2680(h)'s definition of investigative or law enforcement officer based on its explicit language.

Even if we assume the definition is ambiguous, the result is the same. TSOs are liable under § 2680(h) because the Supreme Court has instructed us to interpret the Federal Tort Claims Act broadly in favor of waiving the Government's immunity against suit. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491-92 (2006). Thus I would reverse the District Court's ruling as to § 2680(h) and allow Pellegrino's false arrest, false imprisonment, and malicious prosecution claims to proceed to trial.

2

## I. Background Matters

### A. Factual Background

For ease of reference, I restate the facts as I understand them. On July 29, 2006, Pellegrino and her husband Harry Waldman arrived at the Philadelphia International Airport to board a flight home to Florida. After she passed through the security checkpoint, Pellegrino was randomly selected for additional screening. TSO Thomas Clemmons began examining her bags, but she stopped him, demanding a private screening.

TSA employees subsequently led her to a private screening room, where TSOs Nuyriah Abdul-Malik, Laura Labbee, and Denise Kissinger conducted the screening. Kissinger swabbed the front and back of Pellegrino's shirt, and Abdul-Malik screened her luggage. According to Pellegrino, Abdul-Malik's inspection was unduly rough because she allegedly counted Pellegrino's coins and currency, rifled through her papers, examined her cell phone data, read the front and back of her membership and credit cards, and opened and smelled her cosmetics, mints, and hand sanitizer. She claims Abdul-Malik did not close the lids to various containers the latter opened, causing the previously enclosed items to spill inside her bags and damage her property. Pellegrino further contends Abdul-Malik punched, jammed, and forced her belongings back into her luggage, damaging it, her jewelry, and her eyeglasses in the process.

At that point in the search, Pellegrino informed Labbee, the supervisor at the checkpoint, that she intended to report the TSOs' conduct to TSA superiors. After Abdul-Malik had forcibly closed her luggage, Pellegrino also demanded to know "what is going on here[;] both of you are behaving like bitches." In response to Pellegrino's

3

comments, Abdul-Malik asked Labbee to call the police, but the TSOs did not summon law enforcement to arrest Pellegrino at that time. Instead, they continued searching her luggage. Kissinger swabbed various shoes and clothing in Pellegrino's bag, and Abdul-Malik searched the contents of the bag. After they finished, Kissinger and Abdul-Malik told Pellegrino that the search was over and that she could leave the private screening room. She proceeded to move her belongings to a search table outside of the private screening room. She first tossed her shoes from the doorway of the screening room onto the floor of the security checkpoint area after checking that no one else was in her surroundings. She also made multiple trips from the private screening room to the search table because she had three pieces of luggage. On her first trip, she carried her largest bag out of the private screening room. Labbee contends Pellegrino struck her in the stomach with the bottom of the bag as she was moving the bag to the search table. When Pellegrino returned to retrieve a smaller bag, Abdul-Malik allegedly blocked her access to it, forcing her to crawl under a table to retrieve the bag. When Pellegrino did so, it tipped over, striking the ground with a loud noise. Abdul-Malik claims Pellegrino struck her in the leg while she was collecting the bag. She denies striking either Abdul-Malik or Labbee with her luggage and alleges she heard both TSOs say to each other, "You saw her hit me, didn't you?"

After Pellegrino had retrieved her luggage, Labbee and Abdul-Malik walked to the supervisor's station to press charges against her and to summon local police. Labbee directed Pellegrino to stay at the security checkpoint until the police arrived. Although Pellegrino requested that the TSA

4

official in charge of the airport be called to the checkpoint, her request went unheeded.[1]

When the police arrived, Pellegrino was frisked, handcuffed, and arrested. Labbee confiscated her driver's license and, along with Abdul-Malik, swore out criminal complaints against her. Kissinger offered a witness statement corroborating the allegation that Pellegrino struck Labbee in the leg with her bag. The police escorted Pellegrino out of the airport in plain view of other passengers. She was held for roughly 18 hours and released after her husband posted approximately $400 in bail.

The police incident report stated Pellegrino struck both Labbee and Abdul-Malik with her bags and shoes that she tossed out of the private screening room. It also noted both TSOs suffered from leg pain and a stomach bruise as a result of Pellegrino's actions.

Did things calm down? Hardly. The Philadelphia District Attorney's Office charged Pellegrino with ten criminal violations: two counts of felony aggravated assault, *see* 18 Pa. Cons. Stat. § 2702; two counts of possession of an instrument of a crime (the suitcases allegedly used to hit the TSOs), *see id.* § 907; two counts of making terroristic threats, *see id.* § 2706; two counts of simple assault, *see id.* § 2701; and two counts of recklessly endangering another person, *see id.* § 2705. (Someone must have taken creative charging and aced the test; either that or there was a lot of lawyer-lounge temporizing.)

---

[1] While the relevant TSA official was notified that Pellegrino wished to speak with him, neither he nor his representative arrived at the checkpoint to speak with Pellegrino or her husband.

On October 25, 2006, Pellegrino attended a preliminary hearing in her criminal case. The presiding judge dismissed several charges, and the District Attorney abandoned other charges, with the exception of two counts of simple assault and two counts of possession of an instrument of a crime (the suitcases allegedly used to hit the TSOs). Those remaining charges proceeded to trial on March 28, 2008, in Philadelphia Municipal Court. The judge entered not guilty verdicts as to each charge based on insufficiency of the evidence put in by the TSA: it failed to produce video surveillance recordings of the incident;[2] Abdul-Malik failed to appear in court; and Labbee's testimony was internally inconsistent and contradictory on key points.

## B.    Procedural Background

After criminal proceedings concluded, Pellegrino submitted a claim to the TSA describing the TSOs' conduct during and following the July 29th incident at the airport. The TSA denied the claim, and Pellegrino turned to federal court for relief. She alleged numerous constitutional and statutory violations against the TSA, Abdul-Malik, Labbee, Kissinger, and other unnamed TSOs. The District Court dismissed most of her claims except for property damage,

---

[2] On August 14, 2006, Pellegrino received a letter from the TSA indicating it was considering imposing a civil penalty for her actions during the July 29th incident at the airport. The TSA's letter also stated it had begun a Civil Action Enforcement investigation of the incident. Pellegrino's attorney wrote to and spoke with the TSA to defer the investigation and to preserve any relevant surveillance footage. It, however, maintained that no video cameras had captured the incident and thus no recordings existed for evidentiary purposes.

false arrest, false imprisonment, and malicious prosecution under the Federal Tort Claims Act and her *Bivens* claims for malicious prosecution under the First and Fourth Amendments. During summary judgment, the Court ruled in favor of the TSA on all of her remaining claims except for the property damage claim, which the parties later settled.

Although Pellegrino appeals the District Court's rulings on all of her claims, I focus on those for false arrest, false imprisonment, and malicious prosecution under the Federal Tort Claims Act. The Court held it lacked jurisdiction over those claims because they do not fall within § 2680(h)'s proviso, which waives sovereign immunity for certain intentional torts committed by investigative or law enforcement officers. Although the proviso defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law," 28 U.S.C. § 2680(h), the District Court stated the phrase "searches . . . for violations of Federal law" was "ambiguous," *Pellegrino v. Transp. Sec. Admin.*, No. 09-5505, 2014 WL 1489939, at *5 (E.D. Pa. Apr. 16, 2014).

Because "[t]he relevant statutory scheme shed[] little light on how broadly 'search' is to be defined," the Court turned to legislative history. *Id.* at *6. In its view, § 2680(h)'s legislative history "strongly suggests that the . . . proviso was enacted as a response to specific eg[]regious behavior during raids conducted by federal law enforcement officers . . . and was not intended to be expansive enough to cover airport security screeners." *Id.* at *7. As such, it denied relief to Pellegrino on her false arrest, false imprisonment, and malicious prosecution claims. She appeals, challenging, among other things, the District Court's determination that it lacked jurisdiction over her claims.

7

### C.      Statutory Background

As noted, the Federal Tort Claims Act waives sovereign immunity for certain torts committed by federal employees. "[Its] provisions are contained in two areas of the United States Code." *Simmons v. Himmelreich*, 136 S. Ct. 1843, 1846 (2016). The first, "28 U.S.C. § 1346(b), gives federal district courts exclusive jurisdiction over tort claims against the United States for the acts of its employees '[s]ubject to the provisions of chapter 171' of Title 28." *Id.* (footnote omitted) (quoting 28 U.S.C. § 1346(b)). "Chapter 171, in turn, . . . comprises the remaining provisions of the [Act]," including § 2680, which contains exceptions to the Act's broad waiver of immunity. *Id.*

Of all the exceptions listed in § 2680, subsection h is most pertinent to this appeal. In full it states:

> The provisions of . . . section 1346(b) [that is, the waiver of immunity] of this title shall not apply to — . . .
>
> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse

of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h). The first part of § 2680(h) extends sovereign immunity for any claim traced to "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id.* As noted, it is an exception to the Federal Tort Claims Act, and the Government has the burden of proving it applies. *See S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 n.2 (3d Cir. 2012) (stating exceptions to the Federal Tort Claims Act are "analogous to . . . affirmative defense[s]"); *see also Bunch v. United States*, 880 F.3d 938, 941 (7th Cir. 2018) (Wood, C.J.) ("The burden . . . shift[s] to the [G]overnment to support its affirmative defense that the exception . . . for intentional torts applies and is not vitiated by the . . . proviso.").

The second part of § 2680(h) is a "proviso" and an exception to the exception, as it reasserts the Federal Tort Claims Act's waiver of sovereign immunity when certain intentional torts are committed by "investigative or law enforcement officers." 28 U.S.C. § 2680(h). Importantly, it also contains its own definition of "investigative or law enforcement officer" that we "must follow . . . even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000).

9

## II.    TSOs are investigative or law enforcement officers under § 2680(h).

Relying on § 2680(h)'s text, Pellegrino argues TSOs are "investigative or law enforcement officers" because they are legally empowered to execute searches for violations of federal law.   The Government responds that the proviso encompasses only those who exercise traditional law enforcement functions.   Asserting that "Congress . . . did not empower [TSOs] with law enforcement authority," the Government contends TSOs do not fall within its carve-out from immunity.   Gov't Suppl. Br. at 11.

Neither side disputes that TSOs conduct administrative searches.   *See United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir. 2006) ("[The appellant's] search at the airport checkpoint was justified by the administrative search doctrine.").   Indeed, Pellegrino uses this point to argue that TSA screenings are "searches . . . for violations of Federal law" under § 2680(h).   In view of this argument, my colleagues characterize her position as extending to *all* administrative searches.   According to them, her reading "would sweep into [§ 2680(h)'s] ambit large swaths of the federal workforce, producing an unprecedented expansion of the United States' tort liability."   Majority Op. at 27.

But Pellegrino's position is not that far-reaching.   *See* Corrected Tr. of Oral Arg. at 9:1–2 (*amicus* counsel on behalf of Pellegrino stating we need not address whether certain regulatory searches fall within § 2680(h)'s proviso because those cases "are not before [us] today" (internal punctuation altered)), 10:13–14 (*amicus* counsel stating the issue of other regulatory searches is not "before [us] right now").   Instead of directing her arguments to all administrative searches, Pellegrino asks us to resolve whether TSOs are investigative or law enforcement officers under § 2680(h).   She notes that

10

TSA screenings are more expansive than traditional administrative inspections, as they extend to the general public and often involve searches of an individual's physical person. *See* Suppl. Reply Br. at 13-14. In light of these differences, she claims TSA screenings fall within the ambit of § 2680(h).

I agree that TSA screenings are searches under § 2680(h) and that TSOs are "investigative or law enforcement officers" as defined by the proviso. The plain text of the statutory scheme supports this outcome. And even if there were ambiguity here, we must construe it in Pellegrino's favor. Thus her false arrest, false imprisonment, and malicious prosecution claims should survive summary judgment and proceed to trial.

### A. TSOs execute searches for violations of federal law.

As noted, TSOs may qualify as investigative or law enforcement officers if they "execute searches . . . for violations of Federal law." 28 U.S.C. § 2680(h). To determine whether TSOs execute searches, I begin with the Aviation and Transportation Security Act (the "Transportation Security Act"). In pertinent part, it requires TSOs to screen "all passengers and property, including United States mail, cargo, carry-on and checked baggage, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation." 49 U.S.C. § 44901(a). It defines screening in one context as "a *physical search* together with manifest verification," *id.* § 44901(g)(5) (emphasis added), and in other contexts as "[an] inspection of individuals, accessible property, checked baggage, and cargo," 49 C.F.R. § 1546.207(a); *see also*

11

*Bunch*, 880 F.3d at 943 (stating inspections are searches under the proviso).

TSA screenings no doubt are "permissible under the administrative search doctrine." *Hartwell*, 436 F.3d at 181; *see also George v. Rehiel*, 738 F.3d 562, 577 (3d Cir. 2013) ("It is not disputed that the initial airport screening to which [the Appellant] was subjected by the TSA Officials was a constitutionally permissible administrative search under the Fourth Amendment, even though it was initiated without individualized suspicion and was conducted without a warrant."). Thus, if the term "search" in § 2680(h) is synonymous with the term "search" as used in interpreting the Fourth Amendment, the inquiry likely ends here.

The Government does not dispute this point. Instead, it contends TSA screenings are not searches under § 2680(h)'s proviso because they are consensual and limited in nature. It also asserts the definition of "search" under § 2680(h) is narrower than the meaning of the word "search" under the Fourth Amendment.

Although we have not squarely decided this issue, the Ninth Circuit has held that airport screenings do not depend on a passenger's consent. *See United States v. Aukai*, 497 F.3d 955, 961 (9th Cir. 2007) (en banc). We approvingly quoted the Ninth Circuit's analysis in *George v. Rehiel*. *See* 738 F.3d at 575 ("The constitutionality of an airport screening search . . . does not depend on consent. . . . [A]ll that is required is the passenger's election to attempt entry into the secured area. Under current TSA regulations and procedures, that election occurs when a prospective passenger walks through the magnetometer or places items on the conveyor belt of the x-ray machine." (internal quotation marks omitted) (quoting *Aukai*, 497 F.3d at 961)). Moreover, the TSA's regulations suggest TSO screenings are not consensual; any

12

individual who does not consent to a screening may not board a flight. *See* 49 C.F.R. § 1540.107(a) ("No individual may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person and accessible property in accordance with the procedures being applied to control access to that area or aircraft under this subchapter."); *id.* § 1544.201(c)(1) ("Each aircraft operator . . . must refuse to transport - (1) [a]ny individual who does not consent to a search or inspection of his or her person. . . ."). Under a reasonable reading of our case law and the pertinent regulations, TSA screenings are not consensual searches. It follows that "consent" is not an adequate basis for concluding TSA screenings fall outside the proviso in § 2680(h).

Similarly, the limited nature of TSA screenings does not put them outside the ambit of the proviso. To start, its plain language does not require searches to be limited or broad in nature. Its words also do not require searches to be directed to all violations of federal law or to traditional law enforcement functions. They simply require investigative or law enforcement officers to "execute searches . . . for violations of federal law." TSO screenings are searches for violations of federal law because they are directed to illegal and prohibited items on passenger aircraft. *See, e.g.*, 49 U.S.C. § 46505 (providing criminal penalties for "[c]arrying a weapon or explosive on an aircraft"); 49 C.F.R. §§ 172.101, 175.10(a) (listing "hazardous materials" that are not permitted on flights).[3] Hence the limited nature of TSA's

---

[3] My colleagues claim that "most of the prohibited items for which TSOs search are perfectly legal to possess in other contexts" and assert that TSOs may only assess civil penalties for screening violations. Majority Op. at 45 & n.29. In my view, these distinctions are not enough to exclude

13

screenings is not sufficient to exclude them from the scope of § 2680(h)'s carve-out from immunity.

Finally, while the proviso provides no definition for the term "search," the lack of statutory guidance does not weigh in the Government's favor. In *Terry v. Ohio*, the Supreme Court stated that a search includes "a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons." 392 U.S. 1, 16 (1968). Congress likely knew and adopted this definition of search in enacting § 2680(h) because "it is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in

---

TSOs from the proviso's reach, as many other law enforcement officers search for items that are "perfectly legal to possess in other contexts" and also impose civil penalties for screening violations. *See, e.g.*, *Bringing Agricultural Products into the United States*, U.S. Customs & Border Prot., https://www.cbp.gov/travel/clearing-cbp/bringing-agricultural-products-united-states (last visited July 9, 2018) (stating Customs and Border Protection agricultural specialists may assess civil penalties if a traveler brings certain agricultural products without appropriate "permits"); *see also CBP Careers in Focus: Agricultural Specialists – Protecting American Agriculture*, U.S. Customs & Border Prot., https://www.cbp.gov/careers/join-cbp/which-cbp-career/agriculture-specialist-focus (last visited July 9, 2018) (noting agricultural specialists "work[] in a . . . law[-]enforcement environment").

the body of learning from which it was taken. . . ."[4]  *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012) (internal quotation marks omitted); *see also Molzof v. United States*, 502 U.S. 301, 307 (1992) (stating "[t]his rule carries particular force in interpreting the [Federal Tort Claims Act].").  *Terry*'s definition of "search" is also consistent with the TSA's own description of pat-down searches: "inspection[s] of the head, neck, arms, torso, legs, and feet . . . [,] includ[ing] head coverings and sensitive areas such as breasts, groin, and the buttocks."[5]  *Security Screening*, Transp. Sec. Admin.,

---

[4] The Supreme Court decided *Terry* six years before Congress enacted § 2680(h).  *Compare Terry v. Ohio*, 392 U.S. 1 (1968), *with* Act of March 16, 1974, Pub. L. No. 93-253, 88 Stat. 50.

[5] Even though pat-down searches are conducted analogously to *Terry* stops, the majority states they are not comparable because the latter "require reasonable, articulable suspicion."  Majority Op. at 46.  This misapprehends the TSA's screening procedures, which (in some instances) allow for pat-down searches if "a lower level of screening disclose[s] a reason to conduct a more probing search." *Hartwell*, 436 F.3d at 180; *see also* Bob Burns, *TSA Mythbuster: The Rest of the DFW Pat-Down Story*, Transp. Sec. Admin. (Mar. 28, 2017), https://www.tsa.gov/blog/2017/03/28/tsa-mythbuster-rest-dfw-pat-down-story (noting pat-down searches may be conducted "if the screening technology alarms").

The majority also claims we previously concluded that "screenings that escalate to a pat-down may be properly categorized . . . as a 'single search under the administrative search doctrine.'"  Majority Op. at 47 (quoting *Hartwell*, 436

https://www.tsa.gov/travel/security-screening (last visited July 9, 2018). Thus "search" in § 2680(h) is synonymous with the term "search" as used in the Fourth Amendment, and TSA screenings are searches under § 2680(h).

## B. TSOs are empowered to conduct searches for violations of federal law.

To repeat, § 2680(h) requires that an investigative or law enforcement officer be "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." The Government argues that "Congress did not grant [TSOs] . . . any independent authority to conduct a search, seizure, or arrest." Gov't Suppl. Br. at 9. As such, it contends TSOs lack any legal authority to conduct airport screenings.

That contention is incorrect because the Transportation Security Act empowers TSOs to conduct screenings for "flights and flight segments originating in the United States." *See* 49 U.S.C. § 44901(a). It defines "screening" to include both "a *physical search* together with manifest verification," *id.* § 44901(g)(5) (emphasis added), and "[an] inspection of individuals, accessible property, checked baggage, and cargo," 49 C.F.R. § 1546.207(a). Thus, per the explicit language of the statute, TSOs are empowered by law to

F.3d at 178). Our precedent, however, did not reach that holding. *See Hartwell*, 436 F.3d at 178 ("We will employ [the Fifth Circuit's] method of analyzing Hartwell's entire experience as a single search under the administrative search doctrine, and—finding this approach sufficient to resolve the case—do not pass judgment on the [Second Circuit's] approach.").

perform searches.  *See Bunch*, 880 F.3d at 943 (stating inspections may be searches under the proviso).

### C.    TSOs are officers of the United States.

Finally, § 2680(h) requires TSOs to be "officers of the United States."  Although it does not define the term "officer," its neighboring provisions differentiate between "officers" and "employees."  For instance, 28 U.S.C. § 2671 defines "employee of the government" to include "officers or employees of any federal agency," indicating that officers and non-officer employees are mutually exclusive.  Similarly, 28 U.S.C. § 1346(b)(2) bars certain individuals from "bring[ing] a civil action against the United States or an agency, officer, or employee of the Government."

The Transportation Security Act also distinguishes between officers and employees.  Although it classifies TSOs as "Federal Government employee[s]," 49 U.S.C. § 44901(a), it incorporates the definition of employee in 5 U.S.C. § 2105, which states:

> For the purpose of this title, "employee[,]" . . . *means an officer* and an individual who is—
>
> > (1) appointed in the civil service by one of the following acting in an official capacity—
> >
> > > (A) the President;
> > >
> > > (B)      a Member or Members of Congress, or the Congress;
> > >
> > > (C)   a member of   a   uniformed service;

17

(D) an individual who is an employee under this section;

(E) the head of a Government controlled corporation; or

(F) an adjutant general designated by the Secretary. . . ;

(2) engaged in the performance of a Federal function under authority of law or an Executive act; and

(3) subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position.

5 U.S.C. § 2105 (emphasis added). The term "officer" is further defined in 5 U.S.C. § 2104, which provides:

For the purpose of this title, "officer[,]" . . . except as otherwise provided by this section or when specifically modified, means a justice or judge of the United States and an individual who is—

(1) required by law to be appointed in the civil service by one of the following acting in an official capacity—

(A) the President;

(B) a court of the United States;

(C) the head of an Executive agency; or

18

(D) the Secretary of a military department;

(2) engaged in the performance of a Federal function under authority of law or an Executive act; *and*

(3) subject to the supervision of an authority named by paragraph (1) of this section, or the Judicial Conference of the United States, while engaged in the performance of the duties of his office.

*Id.* § 2104 (emphasis added).[6] "Executive agency," defined in 5 U.S.C. § 105, "means an Executive department, a Government corporation, and an independent establishment." Finally, for purposes of Title 5, an "independent establishment" is defined as "(1) an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an Executive department, military department, Government corporation, or part thereof, or part

---

[6] TSOs are not officers under 5 U.S.C. § 2104's conjunctive test because they are not appointed by the head of an Executive agency. *See* 5 U.S.C. § 105 (noting an "Executive agency" includes "an Executive department, a Government corporation, and an independent establishment"); 49 U.S.C. § 44935 note (stating TSOs are appointed by the Under Secretary of Transportation for Security). More importantly, Title 5 is not an appropriate guide in this context, as it excludes several federal agents who are unquestionably "investigative or law enforcement officers" under § 2680(h). *See infra* pp. 20-21.

of an independent establishment; and (2) the Government Accountability Office." *Id.* § 104.

At oral argument, both sides agreed that § 2104's definition of officer is underinclusive in this context, *see* Corrected Tr. of Oral Arg. at 14:4–12, 38:3–4, and *amicus* counsel cited postal inspectors as support for this point, *see id.* at 14:4–12. Under a rigid reading of the text, postal inspectors would not fall within § 2680(h)'s proviso, and yet we know they are not excluded. *See Banks v. Merit Sys. Prot. Bd.*, 854 F.3d 1360, 1362 (Fed. Cir. 2017) ("5 U.S.C. § 104 provides that the Postal Service is *not* an 'independent establishment'—and therefore not an 'Executive agency'— for the purpose of Title 5." (emphasis in original)); *Moore v. United States*, 213 F.3d 705, 708 (D.C. Cir. 2000) (stating postal inspectors are "investigative or law enforcement officers" under § 2680(h)). Similarly, Immigration and Naturalization Service ("INS" and now known as "Immigration and Customs Enforcement" or "ICE") agents are included in § 2680(h)'s proviso even though the INS is not an executive agency under 5 U.S.C. § 105. *See Amend v. Merit Sys. Prot. Bd.*, 221 F. App'x 983, 983-84 (Fed. Cir. 2007) (per curiam) (noting the INS "was part of the Department of Justice" before "INS was abolished . . . and its functions transferred to the Department of Homeland Security"); *Caban v. United States*, 671 F.2d 1230, 1234 (2d Cir. 1982) ("By its terms, [§ 2680(h)] waives the government's immunity to liability arising out of certain intentional torts committed by investigative and law enforcement officers such as the INS agents."). Thus 5 U.S.C. § 2104 cannot be a guidepost for interpreting § 2680(h), as it would lead to incongruous results.

Our sister Circuits have taken a similar approach, holding that both Veterans Administration security guards and INS agents are covered by § 2680(h)'s proviso even

20

though they are statutorily classified as employees. *Compare Celestine v. United States*, 841 F.2d 851, 852 (8th Cir. 1988) (per curiam) (holding "VA hospital security guards are VA police officers" and thus fall within the scope of § 2680(h)), *with* 38 U.S.C. § 902(a) (designating VA police officers as employees); *compare Caban*, 671 F.2d at 1234 ("By its terms, [§ 2680(h)] waives the government's immunity to liability arising out of certain intentional torts committed by investigative and law enforcement officers such as the INS agents."), *with* 8 U.S.C. § 1357(a) (stating agents may be "officer[s] or employee[s]"). This suggests that a federal agent's job responsibilities seem to be more outcome determinative than the agent's employment status. Indeed, if employment status were decisive in this context, Congress could easily insulate federal agents from intentional tort claims by designating them as employees, frustrating the reach of § 2680(h). *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions. . . .").

My colleagues do not agree. They contend that interpreting the proviso to "cover[] only criminal law enforcement officers" maintains the distinction between "officers" and "employees" in other provisions of the Federal Tort Claims Act. Majority Op. at 19; *see also id.* at 20 n.11. But that approach "would render a significant part of [§ 2680(h)] a nullity," as there would be no need to define the functions of an "investigative or law enforcement officer" if the provision only referred to "criminal law enforcement officers." *Prot. & Advocacy for Persons with Disabilities v. Mental Health & Addiction Servs.*, 448 F.3d 119, 125 (2d Cir. 2006) (Sotomayor, J.). It would also "violate[] the settled rule that a statute must . . . be construed in such fashion that every word has some operative effect." *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992); *see also United*

21

*States v. Palmeri*, 630 F.2d 192, 199 (3d Cir. 1980) ("We should not construe a statute to make it redundant of itself. . . ."). Thus the majority's reading does not "hew more closely" to Congress's definition of "investigative or law enforcement officer." Majority Op. at 40 n.26. Instead, it "transform[s] [it] into surplusage," reading it out of the proviso. *United States v. Kouevi*, 698 F.3d 126, 133 (3d Cir. 2012).

We encounter the same problem if we read "investigative or law enforcement officer" as "a[ny] person who is designated an 'officer' and who performs traditional criminal law enforcement functions." Majority Op. at 20 n.11 (suggesting this interpretation in light of the anti-redundancy canon). This is because Congress listed "investigative or law enforcement officer" in the disjunctive, giving both terms "separate meanings." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise. . . ."). The majority's approach, however, blurs the distinction between each term, effectively deleting "investigative officer" from the proviso's text and "rob[bing]" it "of [any] independent and ordinary significance."[7] *Id.* at 338-39.

-------

[7] My colleagues state "it is not unusual for Congress to define 'law enforcement officer' by reference to the officer's duties, even if those duties all sound in criminal law." Majority Op. at 20 n.11. But Congress did not solely define "law enforcement officer" in § 2680(h). It also included the term "investigative officer." We fail to give that term any distinct meaning if we adopt the reading my colleagues advance, as it would excise "investigative officer" entirely from the proviso's text.

It is worth noting that the Seventh Circuit refused to adopt the same reading in a recent case. *See Bunch*, 880 F.3d at 943-45. Instead of limiting the proviso's reach to law enforcement officers, *see* Gov't Br. at 22, *Bunch v. United States*, No. 16-3775 (7th Cir. May 3, 2017) (advancing this argument), the Court noted § 2680(h) covers "both investigative *and* law[]enforcement officers," *Bunch*, 880 F.3d at 944 (emphasis in original). More importantly, it held a chemist in the Bureau of Alcohol, Tobacco, and Firearms ("ATF") could fall within the proviso's terms. *See id.* at 943 ("The materials presented . . . at the summary-judgment stage do not foreclose the possibility that the law empowered Kinard (and his fellow chemists) to execute searches or to seize evidence."). In reaching its holding, the Court assigned no significance to the types of inspections (*i.e.*, searches) the chemist could perform. *See id.* (stating 27 C.F.R. § 55.31 (1995) authorizes ATF officers to "inspect the site of any accident or fire" (internal quotation marks omitted)). Nor did it distinguish between officers and employees. *See id.* (acknowledging the regulations also defined an "ATF officer" as "*[a]n officer or employee* of the Bureau of Alcohol, Tobacco[,] and Firearms (ATF) authorized to perform any function related to . . . *administration* or enforcement" (first alteration in original) (emphases added) (internal quotation marks omitted)). Rather, it looked to the chemist's job responsibilities, examining them vis-à-vis the proviso's language. *See id.* The majority, by contrast, limits the proviso's reach before undertaking this analysis. This is at odds with the Seventh Circuit's reasoning, and it leaves plaintiffs across the country without a consistent set of remedies.

While the Supreme Court has not decided this issue, it has also been reluctant to constrict the proviso's scope. *See Millbrook v. United States*, 569 U.S. 50, 54, 57 (2013) (declining to read additional language into § 2680(h)'s

23

"unambiguous text" and overruling *Pooler v. United States*, 787 F.2d 868 (3d Cir. 1986), and its progeny, including *Matsko v. United States*, 372 F.3d 556 (3d Cir. 2004)). Critically, it rejected an interpretation that would cabin the definition of "investigative or law enforcement officer." *See id.* at 56. In the Court's view, "[h]ad Congress intended to . . . narrow the scope of the proviso," it would have included language to that effect. *Id.* at 57; *see also Campos v. United States*, 888 F.3d 724, 737 (5th Cir. 2018) (noting *Millbrook* "refus[es] to allow limitations to be placed on the . . . proviso").

The same principle is apt here: if Congress intended § 2680(h) to apply solely to criminal law enforcement officers, it would have "limited it to claims arising from 'acts or omissions of [criminal] law enforcement officers'" and would not have included any additional definitional language. *Millbrook*, 569 U.S. at 57; *see also Burgess v. United States*, 553 U.S. 124, 129 (2008) ("Statutory definitions control the meaning of statutory words . . . in the usual case." (alteration in original) (internal quotation marks omitted)); *Stenberg*, 530 U.S. at 942 ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."). Thus, in light of its statutory definition and Supreme Court precedent, § 2680(h)'s references to "investigative officers" and "any officer of the United States" cannot solely encompass criminal law enforcement officers.

My colleagues do not discuss much of this case law. Instead, they rely on non-text authorities to advance their reading of "officer." *See infra* Part III.A-B (addressing the majority's arguments). I do not follow their approach because it is our job to construe Congress's language "in accordance with its ordinary meaning." *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014) (internal

24

quotation marks omitted) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014)). Here, if we look to dictionary definitions to determine Congress's intent, they do not contain any reference to law enforcement personnel. *See Officer*, Webster's Third New International Dictionary (1971) (stating an officer is "one charged with administering and maintaining the law (as a constable, bailiff, sheriff)" or "one who holds an office; one who is appointed or elected to serve in a position of trust, authority, or command esp[ecially] as specif[ically] provided for by law"); *Officer*, Black's Law Dictionary (4th ed. rev. 1968) (noting an officer is "[o]ne who is charged by a superior power (and particularly by government) with the power and duty of exercising certain functions. One who is invested with some portion of the functions of the government to be exercised for the public benefit. . . ."). This cuts against my colleagues' interpretation, as it tells us the proviso's reach is more expansive than their take.

I am mindful that "a 'word must not be read in isolation but instead [is] defined by reference to its statutory context.'" *Husmann*, 765 F.3d at 173 (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 234 (2008)). But this too does not favor a restrictive reading of the proviso. Instead, it marshals against the majority's approach, as the term "any officer of the United States" must be read to "ha[ve] a wide reach." *Boyle v. United States*, 556 U.S. 938, 944 (2009) ("The term 'any' ensures that the definition has a wide reach. . . ."); *see also Ali*, 552 U.S. at 220 ("Congress'[s] use of 'any' to modify 'other law enforcement officer' [in § 2680(c)] is most naturally read to mean law enforcement officers of whatever kind."). Thus "any officer of the United States" includes (1) those "charged with administering and maintaining the law" and (2) those "who [are] appointed or elected to serve in a position of trust, authority, or command." *Officer*, Webster's Third New International Dictionary

25

(1971). These definitions are consistent with the statutory scheme and comport with my earlier observation that an "agent's job responsibilities seem to be . . . outcome determinative" under § 2680(h). More importantly, they suggest that my colleagues' reading is not consistent with the proviso's plain meaning.[8]

If we apply these definitions in this context, TSOs qualify as officers. They are charged with administering and maintaining the law, and their searches are directed to illegal and prohibited items on passenger aircraft. *See* 49 U.S.C. § 46505 (providing criminal penalties for carrying a weapon or explosive on aircraft); *see also* 49 C.F.R. §§ 172.101, 175.10(a) (listing "hazardous materials" that are not permitted on flights). They also qualify as officers under the second definition because they are appointed by the Under

---

[8] The majority criticizes my use of "general dictionary definitions" and claims they unnecessarily expand the proviso's scope. Majority Op. at 47 n.30. Those definitions, however, are consistent across multiple dictionaries and fit the broader context of § 2680(h). The majority, by contrast, offers no definition of its own and instead relies on non-textual sources to dilute its plain meaning.

Moreover, my reading of the provision would not expand its reach. I do not add extra text to it or assert that it should apply to officers who have no power to search, seize evidence, or make arrests. Rather, I give effect to Congress's language in its entirety without adding, as my colleagues do, limitations from outside sources. *See id.* at 20-25 (relying on other statutes and inapplicable canons of construction to construe the proviso).

26

Secretary of Transportation for Security, *see* 49 U.S.C. § 44935 note, and have the sole authority to conduct pre-boarding screenings for "flights . . . originating in the United States," *id.* § 44901(a).

Accordingly, TSOs are unambiguously "officers of the United States" and thus fall within § 2680(h)'s proviso.

> **D.    Even were the text of the proviso ambiguous, we must resolve that ambiguity against the Government and in Pellegrino's favor.**

My colleagues assert that § 2680(h) is ambiguous. *See, e.g.*, Majority Op. at 21-22 n.12. They claim "an unclear definitional phrase"—here, "investigative or law enforcement officer"—"may take meaning from the term to be defined." *Id.* at 23 (alteration omitted) (internal quotation marks omitted) (quoting *United States v. Stevens*, 559 U.S. 460, 474 (2010)).

But the language of the proviso is neither ambiguous nor vague. Instead, it sets out two terms, "investigative or law enforcement officer," and gives them a precise definition. My colleagues do not point to a single word in the definition that is unclear. Rather, they seem troubled by the "unintended breadth" of the proviso and consider that perception a license to construe it narrowly. *Id.* at 22 n.12 (internal quotation marks omitted). This is not enough to establish ambiguity.

However, even if we assume the text is ambiguous, it would not authorize us to construe the proviso narrowly in favor of sovereign immunity and against Pellegrino's claims. Instead, the Supreme Court has instructed us to construe the Federal Tort Claims Act broadly and has stated that it "does *not* implicate the general rule that 'a waiver of the

27

Government's sovereign immunity will be strictly construed . . . in favor of the sovereign.'" *Dolan*, 546 U.S. at 491 (emphasis added) (quoting *Lane v. Peña*, 518 U.S. 187, 192 (1996)); *see also Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984) ("[U]nduly generous interpretations of the [Federal Tort Claims Act's] exceptions run the risk of defeating the central purpose of the statute."); *United States v. Yellow Cab Co.*, 340 U.S. 543, 554 (1951) (declining to construe the Federal Tort Claims Act in favor of sovereign immunity). As the proviso reasserts the Federal Tort Claims Act's waiver of sovereign immunity, we must resolve any ambiguity against the Government—that is, in favor of allowing Pellegrino's claims to proceed to trial.

Nonetheless, my colleagues note that *Dolan* tells us to construe the proviso in favor of the Government. *See* Majority Op. at 48 n.31 ("To the extent *Dolan* does apply to an *exception to an exception,* it directs us 'to identify those circumstances which are within the words and reason of the *exception*—no less and no more.'" (emphases added) (internal quotation marks omitted) (quoting *Dolan*, 546 U.S. at 492)). But that approach misconstrues *Dolan*, which discussed this rule in the context of § 2680's subsections, almost all of which extend sovereign immunity. *See* 546 U.S. at 492 ("Hence, the proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify 'those circumstances which are within the words and reason of the *exception* [*i.e.*, the parts of § 2680 that are exceptions to the Federal Tort Claims Act's waiver of immunity]—no less and no more. Having made that inquiry here, we conclude [the Petitioner's] claims fall

28

outside § 2680(b)." (emphasis added) (internal quotation marks omitted) (internal citation omitted)).[9]

Moreover, we cannot apply *Dolan*'s language here, as the Supreme Court in *Millbrook* took a markedly different approach in our context, casting the proviso in a broad light. *See* 569 U.S. at 57 ("Had Congress intended to further narrow the scope of the proviso, Congress could have limited it. . . ."); *see also Campos*, 888 F.3d at 737 (discussing "*Millbrook*'s refusal to allow limitations to be placed on the . . . proviso"); *Bunch*, 880 F.3d at 945 ("We are also influenced by the broad reading of the law[]enforcement proviso that the Court adopted in *Millbrook*.").

My colleagues also claim our case is governed by *Foster v. United States*, 522 F.3d 1071 (9th Cir. 2008). Though *Foster* discusses an exception to an exception (*i.e.*, those portions of § 2680 that reassert waiver), its analysis is circumscribed to § 2680(c)(1)-(4), a provision that has no bearing on Pellegrino's claims. *See id.* at 1079 ("[T]he text of § 2680(c)(1)-(4), uncontradicted by its legislative history, provides some support for a narrow reading of the re-waiver [a waiver, followed by an exception to the waiver (thus no waiver), followed by an exception to the exception (hence back to a waiver) is called a re-waiver] of sovereign immunity in forfeiture actions. . . ."). Its holding is similarly

---

[9] 28 U.S.C. § 2680(b) contains only an exception to the Federal Tort Claims Act, as it states, "The provisions of . . . [§] 1346(b) of this title shall not apply to— . . . (b) [a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter." It does not contain an exception to the exception (*i.e.*, a proviso) that reasserts the waiver.

limited to § 2680(c)(1)-(4), and it provided no indication whether the Court would reach the same result in the context of § 2680(h). *See id.* ("Consequently, we hold that the re-waiver of sovereign immunity in 28 U.S.C. § 2680(c)(1)-(4) applies only to property seized solely for the purpose of forfeiture, even if the government had in mind, and later pursued, judicial forfeiture of property seized initially for a legitimate criminal investigative purpose."). Thus *Foster* does not provide an adequate basis for narrowly reading § 2680(h)'s proviso.

Accordingly, even if the text were ambiguous, we are bound to resolve that ambiguity against sovereign immunity. *See Millbrook*, 569 U.S. at 57; *Campos*, 888 F.3d at 737; *Bunch*, 880 F.3d at 945. As such, § 2680(h) does not bar Pellegrino's false arrest, false imprisonment, and malicious prosecution claims.

## III. The majority's arguments do not counsel a different result.

My colleagues arrive at a different outcome after consulting various canons of construction, similar statutes across the Code, and the text of the Transportation Security Act. They examine the legislative history surrounding § 2680(h) and our sister Circuits' case law for guidance. In view of these sources, they hold that § 2680(h)'s proviso extends only to criminal law enforcement officers and thus does not apply to TSOs.

While some of their reasoning may be supportive in isolation, it cannot prevail over the clear text of § 2680(h). Nor can it overcome binding Supreme Court precedent that directs us how to apply the canons of construction and interpret statutory definitions. Consequently, I do not believe the proviso can be read to exclude TSOs from its reach.

30

**A.    Per Supreme Court precedent, we cannot employ the canons of construction to constrict the proviso's clear and unambiguous text.**

To recap my colleagues' reasoning, they claim § 2680(h)'s proviso is directed to criminal law enforcement officers because each of its powers—"'to execute searches, to seize evidence, or to make arrests for violations of Federal law'—has criminal law connotations." Majority Op. at 20 (quoting 28 U.S.C. § 2680(h)). They state that each of the powers "helps give meaning to the others, reinforcing that . . . the term 'investigative or law enforcement officer' . . . means those officers who perform criminal law enforcement functions." *Id.* at 21. In support of their position, they rely on the canon *noscitur a sociis*, which tells us that "a word is known by the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).

Although this canon is a "useful rule of construction . . . where words are of obscure or doubtful meaning," *Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923), it is not used when the text is unambiguous, *see Bilski v. Kappos*, 561 U.S. 593, 604 (2010) (noting the canon was inapplicable because the pertinent provision already contained a statutory definition); *United States v. Stevens*, 559 U.S. 460, 474 (2010) (declining to apply *noscitur a sociis* when the text "contain[ed] little ambiguity"). "[W]hen words have a clear definition, and all other contextual clues support that meaning, the canons cannot properly defeat Congress's decision to draft broad legislation." *Yates v. United States*, 135 S. Ct. 1074, 1097 (2015) (plurality opinion) (Kagan, J., dissenting).

Here, because § 2680(h) was enacted six years after the Supreme Court decided *Terry v. Ohio*, "execute searches"

has a clear meaning that derives from the Court's definition of a search: "a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons. . . ." 392 U.S. at 16; *see also Albernaz v. United States*, 450 U.S. 333, 341-42 (1981) ("[I]f anything is to be assumed from the congressional silence on this point, it is that Congress was aware of the [pertinent Supreme Court holding] and legislated with it in mind. It is not a function of this Court to presume that Congress was unaware of what it accomplished. . . ." (third alteration in original) (internal quotation marks omitted)). There is no indication that Congress intended to depart from that meaning when it enacted § 2680(h). Nor is there any indication that the relevant portion of the proviso is ambiguous. In this context, the canons are not in play here. Moreover, "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *id.* at 253-54.

In any event, we have observed that *noscitur a sociis* "is of little help where other evidence reveals that Congress intended to treat the disputed term differently from its neighbors." *In re Cont'l Airlines, Inc.*, 932 F.2d 282, 288 (3d Cir. 1991). "When Congress has separated terms with the conjunction 'or,'" we concluded "that [it] intended to give the terms 'their separate, normal meanings.'" *Id.* (quoting *Garcia v. United States*, 469 U.S. 70, 73 (1984)); *see also In re Gi Nam*, 273 F.3d 281, 288 (3d Cir. 2001) (stating *noscitur a sociis* has "no application" when Congress separates distinct terms with disjunctive phrasing). The Supreme Court has articulated the same view, declining to apply the canon to a list of three "disparate" items—"congressional,

32

administrative, or [Government Accountability Office] sources"—because it would "rob" each term "of its independent and ordinary significance."[10] *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288-89 (2010) (alteration omitted) (internal quotation marks omitted) (quoting *Reiter*, 442 U.S. at 338-39).[11] Although the Court acknowledged that the terms had a

---

[10] Contrary to the majority's assertions, the touchstone of my inquiry is not whether "the statute is phrased in the disjunctive." Majority Op. at 22 n.12. Instead, I examine whether a statutory list contains a set of terms that have "a[] comparable . . . meaning." *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 289 n.7 (2010); *see also infra* note 11.

[11] Although my colleagues state *noscitur a sociis* "is 'often wisely applied where a word is capable of many meanings,'" Majority Op. at 22 n.12 (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)), the Supreme Court's analysis is more nuanced. While the Court has relied on the canon when the terms share "a[] comparable core of meaning," *Wilson*, 559 U.S. at 289 n.7, it has cautioned against it if to do so would "rob" any term "of its independent and ordinary significance," *id.* at 288 (internal quotation marks omitted) (quoting *Reiter*, 442 U.S. at 338-39). Indeed, the Court has rebuked lower courts—including our Circuit— that apply the canon haphazardly without reference to its precedents. *See id.*

Thus, as the majority notes, the Court has relied on the canon to interpret the phrase "exploration, discovery, or prospecting." Before doing so, however, it noted that the words in that phrase had a common "core of meaning" and

33

similar "connotation," that was not a critical factor in its analysis. *Id.* at 289 n.7 (declining to apply the canon to the phrase "congressional, administrative, or GAO sources" even though each term had a "governmental connotation"). Instead, it emphasized each word's distinct meaning and declined to restrict that meaning by way of the canon. *See id.* at 288-89.

The Supreme Court's reasoning is apt here, as § 2680(h)'s proviso lists three separate phrases that describe different activities: "execute searches," "seize evidence," and "make arrests." 28 U.S.C. § 2680(h). All three terms have a "character of [their] own" that cannot be "submerged" by their common connotation. *Russell Motor Car*, 261 U.S. at 519. Thus "execute searches" cannot be read in the same vein as "seize evidence" or "make arrests." Instead, it must be read consistently with its plain meaning, which is delinked as a disjunctive (that is, separate) concept.

With this in mind, the majority suggests the meaning of "execute searches" still sounds in criminal law, as the

---

that the canon would not "rob" any term "of its independent and ordinary significance." *Id.* at 288-89 & n.7 (quoting *Reiter*, 442 U.S. at 338-39); *see also Jarecki*, 367 U.S. at 307 (engaging in this analysis). By contrast, the Court has refused to apply the canon to "congressional, administrative, or GAO sources" because the terms in the list were not "completely harmonious." *Wilson*, 559 U.S. at 288 (alteration omitted).

*Noscitur a sociis* thus is "not an invariable rule" that we must resort to in every instance. *Russell Motor Car*, 261 U.S. at 519. Nor is it in play here, as the terms in § 2680(h) are not synonymous and share no core meaning. *See Wilson*, 559 U.S. at 289 n.7.

34

phrase "execute a search" is typically used when a warrant is involved. The Seventh Circuit recently rejected a similar argument. *See Bunch*, 880 F.3d at 945 ("[W]e note that [§] 2680(h) does not require [a federal agent] to have had authority to seek and execute search *warrants*; it speaks only of executing searches, and many searches do not require warrants." (emphasis in original)). Congress also drafted § 2680(h) to provide a remedy against *warrantless* searches. *See* S. Rep. No. 93-588, at 2790 (1973) (stating § 2680(h) was enacted in the aftermath of raids in Collinsville, Illinois, where federal agents "entered . . . two houses without warrants . . . , kicked in the doors without warning, shout[ed] obscenities, and threaten[ed] the occupants with drawn weapons"). In line with these principles, plaintiffs have relied on § 2680(h) to recover for abuses related to warrantless searches and seizures. *See, e.g.*, *Bunch*, 880 F.3d at 943-44 (holding a forensic chemist's inspection could be a search under § 2680(h)).

My view is that, given the broad reach of the proviso, "execute searches" does not take its meaning from the term "execute a warrant," and its clear-cut meaning governs our analysis. *See id.* at 943, 945 (suggesting "search" in § 2680(h) could refer to inspections performed by officers and employees, a search incident to arrest, searches under the automobile exception, searches performed with consent, and protective sweeps); *Execute*, Webster's Third New International Dictionary (1971) (providing several definitional options of "execute," none of which include a reference to "executing warrants").

**B.     Other statutes are not effective guideposts for interpreting § 2680(h)'s language because none of them contain the same definition.**

My colleagues examine other provisions in the U.S. Code that use the term "investigative or law enforcement officer."  They find that the term is used in only one other statute: Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *see* 18 U.S.C. §§ 2510-2522, and the Electronic Communications Privacy Act of 1986, which amended Title III (for simplicity, I refer to both statutes as "Title III"), *see id.* §§ 3121-3127.  In their view, Title III's context tells us that the term "investigative or law enforcement officer" covers only criminal law enforcement personnel.   Thus they conclude § 2680(h) must also encompass only criminal law enforcement officers.

Title III, however, is not helpful to our inquiry because it provides its own definition of "investigative or law enforcement officer."  It considerably departs from that of § 2680(h), as it includes attorneys.  *See id.* § 2510 (stating an investigative or law enforcement officer is "any officer . . . who is empowered by law to *conduct investigations* of or to make arrests for offenses enumerated in this chapter, and *any attorney* authorized by law to prosecute or participate in the prosecution of such offenses" (emphases added)).  It also includes the term "conduct investigations," while § 2680(h) includes the disjunctive phrases "to execute searches" and "to seize evidence."  *See id.*  With these obvious distinctions, I am doubtful that Title III and § 2680(h) should be read consistently or that the former constricts the latter.  *See Tooahnippah v. Hickel*, 397 U.S. 598, 606 (1970) (declining to construe two provisions similarly because "the coverage of these [two] sections is not identical"); *In re Fed.-Mogul Global Inc.*, 684 F.3d 355, 372-73 (3d Cir. 2012) (noting two

provisions of the Bankruptcy Code should not be read in the same way in view of their distinct language).

In a similar vein, I am not persuaded that other statutory definitions of "law enforcement officer" limit § 2680(h)'s text.[12]  *See* Majority Op. at 25 (listing definitions of "law enforcement officer" in Titles 12 and 18 of the U.S. Code).  Congress gave us no sign that these definitions carry any weight in the context of our case.  Indeed, it could have easily written § 2680(h) to incorporate any of them, but chose not to do so.  *See Millbrook*, 569 U.S. at 56-57 (rejecting an argument that would narrow the definition of "investigative or law enforcement officer" and stating Congress could have restricted the scope of § 2680(h)'s proviso if it wished); *see also Burgess*, 553 U.S. at 130-31 (illustrating that Congress knows how to "incorporate the definition of a particular word into the definition of a compound expression").  Instead (and to repeat), it gave § 2680(h) its own definition of "investigative or law enforcement officer," which we must apply "even if it varies from that term's ordinary meaning." *Stenberg*, 530 U.S. at 942.  We may not resolve any "'dissonance' between ordinary meaning and the unambiguous words of a definition . . . in favor of [the term's] ordinary meaning.  If that were the case, there would hardly be any use in providing a definition." *Bond v. United States*, 134 S. Ct. 2077, 2096 (2014) (Scalia, J., concurring in the judgment).

Accordingly, other provisions and statutory definitions do not illuminate the meaning of § 2680(h)'s proviso and cannot be used to cabin its reach.

---

[12] These definitions also do not shed light on § 2680(h) as a whole because the subsection refers to "*investigative* or law enforcement officers."

### C. The Transportation Security Act does not clarify whether the proviso extends to TSOs.

The majority states § 2680(h)'s proviso does not include TSOs because the Transportation Security Act "distinguishes between 'employees' . . . and 'law enforcement officers.'" Majority Op. at 39. They note it classifies screeners as employees, but at the same time allows the TSA's Under Secretary to "designate an employee . . . to serve as a law enforcement officer." 49 U.S.C. § 114(p)(1). The latter may "carry a firearm[,] make an arrest . . . [,] and . . . seek and execute warrants." *Id.* § 114(p)(2). Because the Act consistently differentiates between screeners and TSA law enforcement officers in this respect, the majority infers the former are not "investigative or law enforcement officers" under § 2680(h).

The Transportation Security Act (like the other statutes discussed above) has its own definition of "law enforcement officer." In full it defines "law enforcement officer" as an "employee" who may. . .

(A) carry a firearm;

(B) make an arrest without a warrant for any offense against the United States committed in the presence of the officer, or for any felony cognizable under the laws of the United States if the officer has probable cause to believe that the person to be arrested has committed or is committing the felony; *and*

(C) seek and execute warrants for arrest or seizure of evidence issued under the authority of the United States upon probable cause that a violation has been committed.

*Id.* § 114(p)(1)-(2) (emphasis added). This definition significantly varies from the expansive definition in § 2680(h), which uses disjunctive phrasing and includes "any officer of the United States who is empowered by law to execute searches, to seize evidence, *or* to make arrests for violations of Federal law." 28 U.S.C. § 2680(h) (emphasis added). The term "law enforcement officer" in § 114(p) is also at odds with the broader term "investigative or law enforcement officer" in § 2680(h). *See* Corrected Tr. of Oral Arg. at 21:21–22:4 (noting this key distinction between § 114(p) and § 2680(h)). In view of these obvious differences, § 114(p) is neither instructive nor helpful in construing § 2680(h).

There is also no indication that Congress drafted § 114(p) with § 2680(h)'s proviso in mind. If Congress intended to use the former to immunize TSOs from liability, it would have "provide[d] a relatively clear indication of its intent in the text of . . . [either] provision." *TC Heartland LLC v. Kraft Food Grp. Brands LLC*, 137 S. Ct. 1514, 1520 (2017). More importantly, had Congress wished to limit the proviso to criminal law enforcement officers, it would have specified as much in § 2680(h). *See Whitman*, 531 U.S. at 468 ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions. . . ."). It did not do so. My takeaway: there is no basis for importing § 114(p) into the Federal Tort Claims Act to bar Pellegrino's claim. Nor is there any reason to use this case to bar other plaintiffs' claims against agents who are not criminal law enforcement officers.

My colleagues do not address these points. Instead, they maintain that "§ 114(p) remains instructive" in this context "because it reflects Congress's own distinction between TSA screeners and 'law enforcement officers' in Title 49, which tracks [the] distinction between 'employees'

and 'officers' in the [Federal Tort Claims Act]." Majority Op. at 40 n.27 (alteration omitted). They claim other statutes similarly distinguish between employees and law enforcement officers and suggest we should follow these distinctions for the purposes of § 2680(h). *See id.* at 40-41 n.27.

I cannot join the majority in adopting this approach because it is an invitation to dilute § 2680(h)'s text. As noted, § 114(p) does not match the proviso's language and does not even define the same terms as the proviso. *Compare* 49 U.S.C. § 114(p) (defining "law enforcement officer" using conjunctive language), *with* 28 U.S.C. § 2680(h) (defining "investigative or law enforcement officer" using disjunctive language). As such, it is not an appropriate guidepost for determining whether TSOs fall within the proviso's reach. *See Bunch*, 880 F.3d at 944 ("[Section 2680(h)] defines ['investigative or law enforcement officer'] as a person with legal authority to 'execute searches, to seize evidence, *or* to make arrests. . . .' Any one of those three powers will do." (emphasis in original) (internal citation omitted) (quoting 28 U.S.C. § 2680(h))).

Instead of narrowing § 2680(h) and importing § 114(p) into its framework, it is our job to enforce the proviso's explicit language. While TSOs do not fall within the terms of § 114(p), they are covered by § 2680(h). Neither § 114(p) nor other sections of the Transportation Security Act expressly preclude TSOs from the scope of the § 2680(h) proviso. Rather, they suggest the opposite: TSOs execute searches, *see* 49 U.S.C. § 44901(a), and have the legal authority to do so, *see id.*[13] Thus, when the statutory scheme

---

[13] Even if the Transportation Security Act were less straightforward in this context, it does not control the interpretation of § 2680(h) because the former postdates the

is considered as a whole, TSOs are investigative or law enforcement officers that are subject to the proviso. *See Bunch*, 880 F.3d at 943-45 (engaging in the same analysis for a forensic chemist employed by the ATF); *Sami v. United States*, 617 F.2d 755, 764 (D.C. Cir. 1979) (concluding U.S. National Central Bureau officers were within § 2680(h), and thus unprotected by immunity, even though they "do not initiate or conduct investigations of their own but act primarily as conduits and screeners of information between foreign police departments and federal and state counterparts" (footnote omitted)), *abrogated on other grounds by Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

Lastly, I note the consequences of my colleagues' approach. No other Court of Appeals has gone as far as they do by categorically barring certain classes of individuals (*i.e.*, those who are not criminal law enforcement officers) from the reach of the proviso. Nor has any other Court of Appeals relied on another statute's and an agency's classifications to determine whether a federal agent is an "investigative or law enforcement officer" under § 2680(h).[14] The majority's

_____

latter. *See McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013) ("Congress legislates against the backdrop of existing law.").

[14] Although the Eleventh Circuit relied on statutory distinctions in *Corbett v. Transportation Security Administration*, it did not reference the agency's own distinctions or non-binding directives in support of its position. *See* 568 F. App'x 690, 701 (11th Cir. 2014) (per curiam). Moreover, *Corbett* was an unpublished opinion, making it non-precedential and non-binding. *See* 11th Cir. R. 36-2, I.O.P. 7 ("The court generally does not cite to its 'unpublished' opinions because they are not binding

41

reasoning would allow Congress—and perhaps even agencies—to exempt individuals from the proviso's reach simply by categorizing them as employees who lack criminal law enforcement powers. *See* Majority Op. at 43 (citing a TSA directive that discusses the distinctions between TSOs and law enforcement officers). It would also empower courts to disregard § 2680(h)'s statutory definition of "investigative or law enforcement officer" in favor of those terms' meanings as perceived by the particular judicial panel. Such a rule would allow courts to expand or contract statutory definitions as they see fit. *See Bond*, 134 S. Ct. at 2096 (Scalia, J., concurring in the judgment) (observing the "judge-empowering consequences" of an "interpretive rule" that would allow a term's ordinary meaning to prevail over its statutory definition). It would further allow Congress to depart from § 2680(h)'s literal text "in vague terms or ancillary provisions." *Whitman*, 531 U.S. at 468. I do not believe that this is the correct interpretive method to apply here. *See Sami*, 617 F.2d at 765 ("We are not inclined to read into [§ 2680(h)'s] language . . . a narrower limitation on liability than that suggested by the plain meaning of the words."). Nor am I convinced this is what Congress intended when it enacted § 2680(h), § 114(p), or other provisions of the Transportation Security Act.

The conclusion for me is simple. I am not inclined to read the proviso in § 2680(h) as narrowly as my colleagues, as I do not see the Transportation Security Act as limiting the scope set by the proviso's simple and direct words.

---

precedent. The court may cite to them where they are specifically relevant to determine whether the predicates for *res judicata*, collateral estoppel, or double jeopardy exist in the case, to ascertain the law of the case, or to establish the procedural history or facts of the case.").

**D.** **Legislative history cannot overcome the clear text of § 2680(h) and does not preclude administrative searches from its purview.**

My colleagues next turn to the legislative history of § 2680(h) and refer to statements made by two members of Congress and comments made at a hearing by a Department of Justice official. They contend these snippets confirm that the proviso covers only criminal law enforcement officers. Ultimately, however, "it is the statute, and not [its legislative history], which is the authoritative expression of the law. . . ." *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 337 (1994). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 556 (3d Cir. 2003) (en banc) (internal quotation marks omitted) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). "[W]e may only look to legislative history if [the] plain meaning produces a result that is not just unwise but is clearly absurd." *United States v. Terlingo*, 327 F.3d 216, 221 n.1 (3d Cir. 2003) (Becker, C.J.) (second alteration in original) (internal quotation marks omitted).

When we look to § 2680(h)'s text, it nowhere makes any limiting reference to criminal law enforcement officers. While the legislative history contains several references to "law enforcement officers," it is worth noting that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). It

43

follows that § 2680(h)'s legislative history does not give us an adequate basis to circumscribe its plain text.

My colleagues also discuss the legislative history of a related provision, 31 U.S.C. § 3724, which authorizes the Attorney General to settle certain claims brought against "an investigative or law enforcement officer as defined in section 2680(h) of [T]itle 28 who is employed by the Department of Justice. . . ." In their view, that provision's history before Congress suggests by analogy § 2680(h) applies only to criminal law enforcement officers, as it specifically excludes from its reach "the litigating arms of the Antitrust Division or . . . the Civil Rights Division." H.R. Rep. No. 101-46, at 8 (1989).

But these references cannot limit the proviso to criminal law enforcement personnel because both the Antitrust Division and Civil Rights Division perform criminal law enforcement functions. *See Sections and Offices*, U.S. Dep't of Justice, https://www.justice.gov/atr/sections-and-offices (last visited July 9, 2018) (indicating the Division has five "[c]riminal [s]ections and [o]ffices"); *About the Division*, U.S. Dep't of Justice, https://www.justice.gov/crt/about-division (last visited July 9, 2018) (stating the Division has a criminal section). Nor does the legislative history differentiate between administrative searches and criminal law enforcement functions, as it indicates § 3724 applies to agents who conduct both.[15] *See* H.R. Rep. No. 101-46, at 7

---

[15] My colleagues claim "the fact that traditional criminal law enforcement officers may also have occasion to perform administrative searches . . . in no way casts doubt on the textual and historical reasons to believe that § 2680(h) and § 3724 exclude from their reach those who perform only administrative searches." Majority Op. at 31-32 n.19

44

(1989) (noting § 3724 applies to "a DEA Agent, . . . a Border Patrolman, or a Deputy Marshal"); *see also* 28 U.S.C. § 566(e)(C) (noting the U.S. Marshals Service is authorized to issue certain types of administrative subpoenas); *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998) ("Limited administrative searches may be conducted at the border. . . ."). Section 3724 thus gives us no reason to exclude administrative searches from the purview of § 2680(h)'s proviso. At best, it tells us that administrative searches may fall within the latter's terms.

However, even if § 3724 lacked these references, we should be mindful that "Congress . . . does not . . . hide elephants in mouseholes." *Whitman*, 531 U.S. at 468. Had it intended the proviso to cover only criminal searches and criminal law enforcement activities, "we would expect the text of . . . [§ 2680(h)] to say so." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1947 (2016). Here, no part of § 2680(h) includes the words "criminal," "criminal searches," or "criminal law enforcement personnel." In the absence of those or similar terms, I cannot join my colleagues in limiting its scope.[16]

---

(emphases omitted). But as noted earlier, § 2680(h) provides no textual basis to exclude administrative searches from its ambit, and § 3724 makes no distinction between administrative searches and other law enforcement functions. Because neither provision explicitly distinguishes the two, we should disdain doing the same, as, among other things, we lack the authority to do so.

[16] Other provisions support my conclusion. Like Title 31, Title 19 contains a section that allows the Treasury Secretary to settle intentional tort claims brought against "an

### E. Our sister Circuits' case law does not restrict § 2680(h)'s reach.

The majority also examines other Circuits' case law, stating "other Courts of Appeals . . . have treated only those performing criminal law enforcement duties as 'investigative or law enforcement officers' under the proviso." Majority Op. at 34. In my colleagues' view, their holding aligns with those Circuits.

I disagree. None of our sister Circuits have stated that criminal law enforcement duties are a prerequisite in the context before us. *Cf. Bunch*, 880 F.3d at 943-45 (rejecting the Government's argument that only law enforcement officers are covered by the § 2680(h) proviso and concluding a chemist who analyzed samples in a laboratory could "execute searches" or "seize evidence" under it). Moreover, "federal courts do not sit as councils of revision, empowered

investigative or law enforcement officer (as defined in section 2680(h) of [T]itle 28) who is employed by the Customs Service. . . ." 19 U.S.C. § 1630. Elsewhere, though, the statute allows Customs officers to "inspect[]" "[a]ll merchandise and baggage imported or brought in from any contiguous country," essentially giving them the authority to conduct searches that resemble TSA screenings. *Id.* § 1461; *see also* 19 C.F.R. § 162.6 ("All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer. . . ."); *United States v. Hill*, 939 F.2d 934, 936 (11th Cir. 1991) (noting "[c]ustoms agents may conduct suspicionless searches. . . ."). Nowhere does the statute immunize such searches from liability. And it does not distinguish between those searches and other traditional criminal enforcement activities.

46

to rewrite legislation. . . ." *United States v. Rutherford*, 442 U.S. 544, 555 (1979). "We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable" or to import a meaning derived from selected case law. *Ali*, 552 U.S. at 228 (footnote omitted). "Instead, we must give effect to the text Congress enacted:" § 2680(h)'s proviso applies to TSOs because it encompasses any officer who is empowered by law to execute searches for violations of federal law. *Id.*

In addition to the Seventh Circuit, *see Bunch*, 880 F.3d at 943-45, other Circuits also have construed § 2680(h) differently from the majority, *see Celestine*, 841 F.2d at 852-53 (omitting the terms "criminal" or "criminal law enforcement officer" in its discussion of § 2680(h)); *Hoston v. Silbert*, 681 F.2d 876, 878-79 (D.C. Cir. 1982) (per curiam) (same); *Caban*, 671 F.2d at 1234-35 (same); *EEOC v. First Nat'l Bank of Jackson*, 614 F.2d 1004, 1007-08 (5th Cir. 1980) (same); *Hernandez v. Lattimore*, 612 F.2d 61, 64 n.7 (2d Cir. 1979) (same); *Solomon v. United States*, 559 F.2d 309, 310 (5th Cir. 1977) (per curiam) (same); *Johnson v. United States*, 547 F.2d 688, 691 (D.C. Cir. 1976) (per curiam) (same). Instead of distinguishing between criminal law enforcement officers and administrative personnel, *see* Majority Op. at 34-37, these Courts have carefully examined whether a defendant's job duties fit the proviso on a case-by-case basis, *see, e.g.*, *Celestine*, 841 F.2d at 852-53 (undertaking this analysis for Veterans Administration hospital security guards); *First Nat'l Bank of Jackson*, 614 F.2d at 1007-08 (same for Equal Employment Opportunity Commission agents); *Johnson*, 547 F.2d at 691 (same for doctors at a Veterans Administration hospital). This indicates the inquiry under § 2680(h) is more contextual than the majority's approach, taking into account an agent's specific powers rather than her status as a criminal law enforcement officer.

Critically, at least two Circuits have not adopted the majority's specific framework. In *Sami v. United States*, the D.C. Circuit held that a defendant was an "investigative or law enforcement officer" even though he lacked several attributes my colleagues deem conclusive in their analysis. 617 F.2d at 765. The Court noted that the defendant's status or training as a law enforcement officer did not control its inquiry. *See id.* at 764. It also assigned no importance to the fact that the defendant did not "initiate or conduct investigations of [his] own but act[ed] primarily as [a] conduit[] and screener[] of information between foreign police departments and federal and state counterparts." *Id.* Rather, it cast § 2680(h)'s legislative history in an expansive light and viewed its text as "set[ting] finite boundaries around the kind of law enforcement abuses for which [Congress] wished to make the [G]overnment liable." *Id.* at 764-65. In doing so, the Court declined to "read . . . a narrower limitation on liability than that suggested by the plain meaning of the words." *Id.* at 765.

As noted, *Bunch* also declined to limit the proviso to law enforcement officers, 880 F.3d at 944-45, and did not limit the term "execute searches" to the criminal context, *id.* at 945.[17] It did not draw any significance from the types of

_____

[17] The majority nonetheless portrays *Bunch* as corroborating its holding because "it offered, as examples of the types of searches covered by the proviso, searches incident to arrest, protective sweeps, and searches conducted pursuant to the automobile exception . . . —*i.e.*, searches conducted by criminal law enforcement officers." Majority Op. at 36 (internal citation omitted). This account of *Bunch* hyperfocuses on an isolated string cite in the Court's opinion, *see Bunch*, 880 F.3d at 945, while ignoring its ultimate conclusion, *see id.* at 943 (holding an *inspection* performed

48

investigations the chemist-defendant performed.[18]  *See id.* at 943.  Nor did it give conclusive weight to the chemist's employment status.  *See id.*  Although he was an "ATF officer," the Court noted that term referred to both "[ATF] officer[s] or employee[s]."  *Id.* (internal quotation marks omitted) (quoting 27 C.F.R. § 55.11 (1995)).

The approach of my colleagues sharply differs from our sister Circuits' reasoning in three main ways.  First, they give determinative weight to an agent's status as a law enforcement officer even though the other Circuits did not do so.  *See id.* at 944-45; *Sami*, 617 F.2d at 764.  Second, they highlight TSOs' limited roles and their dependence on law enforcement officers, and yet this feature had no effect on the Seventh or D.C. Circuit's analysis.  *See Bunch*, 880 F.3d at 944-45; *Sami*, 617 F.2d at 764.  Lastly, they read additional

---

by a *chemist* could be enough to trigger liability for malicious prosecution under § 2680(h)).

[18] Contrary to the majority's assertions, the Seventh Circuit did not emphasize the chemist's criminal law enforcement duties.  Indeed, the word "criminal" never shows up in this portion of its discussion.  *See Bunch*, 880 F.3d at 943.  Although the Court did mention Title 18 of the U.S. Code, it observed the chemist's duties stemmed from Title 27 of the Code of Federal Regulations.  *See id.* ("The Secretary had authority to promulgate regulations to carry out these powers, . . . and he did so in 27 C.F.R. Part 55. . . .  The regulations authorized '[a]ny ATF officer' to 'inspect the site of any accident or fire in which there is reason to believe that explosive materials were involved.'" (third alteration in original) (internal citations omitted) (quoting 27 C.F.R. § 55.31 (1995))).

49

language into the proviso to restrain its reach while *Sami* and *Bunch* expressly refused to do the same. *See Bunch*, 880 F.3d 944-45; *Sami*, 617 F.2d at 765.

In conclusion, my colleagues' interpretive framework finds little support in analogous decisions from our sister Circuits, and at least two Circuits have disregarded the key factors they consider decisive in their analysis.

**F.      Our case law cannot be read as limiting § 2680(h)'s scope.**

My colleagues claim their holding is consistent with *Matsko v. United States*, 372 F.3d 556 (3d Cir. 2004). In their view, *Matsko* effectively narrowed § 2680(h) to criminal law enforcement personnel because it stated that "employees of administrative agencies, no matter what investigative conduct they are involved in, do not come within the . . . [proviso]." *Id.* at 560.

Before discussing *Matsko*, it is important to note that the Supreme Court rejected most of its reasoning in a recent case. *See Millbrook*, 569 U.S. at 54-56 (overruling *Pooler v. United States*, 787 F.2d 868 (3d Cir. 1986), and its progeny, including *Matsko*). As such, it is questionable the effect *Matsko* has in our case. Even if we assume its influence is significant, we cannot read it as categorically excluding all employees from the proviso's reach. As noted already, VA police officers and INS agents would not qualify as "investigative or law enforcement officers" even though we know they are.

The majority acknowledges this, but asserts *Matsko* draws a line "between administrative personnel performing solely administrative functions and those . . . expressly designated law enforcement officers or assigned law

50

enforcement duties." Majority Op. at 33. But the problem with this argument is that *Matsko* made no such distinction. It never mentioned the term "criminal law enforcement officer," nor did it refer to "criminal law enforcement duties." While it explained what types of agents are purportedly outside the realm of the proviso, *Matsko* never told us who would fit within it. Hence it does not stand for the broad holding the majority now attributes to it.

More tellingly, *Matsko*'s principle does not receive universal support from our sister Circuits. *Bunch*, for example, held a *chemist* who was primarily responsible for "investigative conduct"—"inspect[ing] the site of any accident or fire in which there is reason to believe that explosive materials were involved"—could be an investigative or law enforcement officer under § 2680(h). 880 F.3d at 943 (internal quotation marks omitted) (quoting 27 C.F.R. § 55.31 (1995)). It reached this conclusion even though the chemist was "[a]n officer *or* employee of [ATF] . . . authorized to perform any function related to . . . *administration* or enforcement." *Id.* (emphases added) (internal quotation marks omitted) (quoting 27 C.F.R. § 55.11 (1995)).

*Bunch*'s reasoning necessarily conflicts with *Matsko* because it did not give controlling weight to an agent's employment status, *see id.*, and emphasized the same investigatory powers that *Matsko* downplayed, *compare id.* (discussing the chemist's authority to inspect sites of certain accidents or fires), *with Matsko*, 372 F.3d at 560 (noting the defendant had the "authority to inspect mines and investigate possible violations"). This suggests we cannot understand *Matsko* as limiting the types of personnel or activities that fall within § 2680(h)'s terms. If we do, we run the risk of advancing an inconsistent (and unduly narrow) reading of the provision.

51

We encounter a similar problem if we look to *Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017), for guidance. As my colleagues correctly observe, it did not address whether TSOs fall within § 2680(h)'s proviso. Yet they rely on its language to exclude TSOs from its reach. *See* Majority Op. at 38 ("As we explained [in *Vanderklok*,] 'TSA employees typically are not law enforcement officers and do not act as such.'" (quoting *Vanderklok*, 868 F.3d at 208)); *see also id.* at 43 ("As we explained in *Vanderklok*, unlike criminal law enforcement officers, 'line TSA employees are not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers.'" (quoting *Vanderklok*, 868 F.3d at 208)). In their view, *Vanderklok* indicates "TSA screeners conduct only administrative searches, are not criminal law enforcement officers, and thus do not qualify as 'investigative or law enforcement officers' under [§ 2680(h)]." *Id.* at 38.

This approach misconstrues *Vanderklok*, which discussed TSOs' law enforcement powers in the context of a *Bivens* claim for retaliatory prosecution under the First Amendment (a *Bivens* action refers to "a private right of action for damages . . . brought directly under the Constitution against federal officials," *Vanderklok*, 868 F.3d at 198). *See id.* at 208-09 (explaining "there is a practical concern with establishing a court-crafted remedy in the [airport screening context]" because "a First Amendment retaliatory prosecution claim hinges, in part, on whether the allegedly offending government employee had probable cause to take some enforcement action"). It is also inconsistent with the proviso's text, which includes investigative and law enforcement officers separately. In light of *Vanderklok*'s limited scope and § 2680(h)'s expansive language, we cannot presume the two are linked. Nor should we import the case's *dicta* on probable cause and other law enforcement powers to our case, *see Vanderklok*, 868 F.3d at 208, as at least one

other Circuit has declined to do the same, *see, e.g.*, *Bunch*, 880 F.3d at 943-44.[19]

**IV.   By analogizing TSA searches to routine administrative inspections, my colleagues preclude victims of TSA abuses from obtaining any meaningful remedy for a variety of intentional tort claims.**

Finally, my colleagues state that Pellegrino asks for a wholesale expansion of the Government's tort liability for administrative searches.   They analogize TSA searches to routine administrative inspections and claim that a ruling in her favor would lead to a "significant . . . waiver of sovereign immunity" for all administrative screenings.  Majority Op. at 27.

As a preliminary matter, we need not worry that Pellegrino's position would imperil the public fisc because *amicus* counsel allayed our concerns at oral argument: Individuals must file administrative complaints with the TSA before bringing any intentional-tort claims in federal court. In 2015, fewer than 200 individuals (out of 700 million individuals screened) filed complaints alleging the types of

---

[19] The Government argued in *Bunch* that the chemist-defendant was not a law enforcement officer because he "work[ed] primarily in a laboratory analyzing physical evidence gathered by law enforcement agents . . . and provide[d] technical assistance to law enforcement agents. . . ."  Gov't Br. at 24, *Bunch v. United States*, No. 16-3775 (7th Cir. May 3, 2017).  As noted, the Seventh Circuit did not adopt this reading of the proviso.  Nor did it accept that the chemist's job responsibilities barred him from being an officer included within the proviso.

harms that fall within § 2680(h)'s terms. If 2015's statistics are representative, there will be no "flood of litigation" against the Government for alleged TSO abuses. Corrected Tr. of Oral Arg. at 26:20–21.

Similarly, and to repeat for context, Pellegrino's position is not as expansive as the majority portrays it. Instead of asking us to waive immunity in all contexts, she requests that we determine whether TSOs are investigative or law enforcement officers under § 2680(h) and whether TSA screenings fall within its reach. *Amicus* counsel made this point at oral argument, noting the broad question of regulatory searches is not before us at this time. *See id.* at 9:1–2, 10:13–14. Consequently, we should not extrapolate Pellegrino's claims to include all possible administrative searches. *See PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) ("[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further.").

Moreover, TSA searches are markedly different from routine administrative inspections. Unlike the screenings the majority cites (*e.g.*, inspections of books, records, food products, establishments, warehouses, factories, and emission sources), *see* Majority Op. at 26-27 & n.16, TSA searches extend to an individual's physical person and are directed to the general public. TSOs have the authority to conduct "pat-down searches," which include "inspection[s] of the head, neck, arms, torso, legs, and feet . . . [,] includ[ing] head coverings and sensitive areas such as breasts, groin, and the buttocks." *Security Screening*, Transp. Sec. Admin., https://www.tsa.gov/travel/security-screening (last visited July 9, 2018). Given the wide scope of such screenings, they are not comparable to inspections of highly regulated items or

54

facilities. Indeed, the potential for abuse and widespread harm may be greater with TSA searches than with almost any other type of administrative search.

*Amicus* counsel acknowledges this point, highlighting several examples where TSOs abused their powers, injuring passengers. *See* Suppl. Reply Br. at 13-14. For example, TSOs at Denver International Airport "manipulated the security system . . . so that one of them, a man, could grope 'attractive' male passengers coming through the checkpoint. . . ." Lindsey Bever, *TSA Employees Accused in Scanner Scam to 'Grope' Male Passengers*, Wash. Post (Apr. 15, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2015/04/15/tsa-employees-accused-in-scanner-scam-to-grope-male-passengers. Although the TSA retained video footage, it could not identify any victims, which influenced the prosecutors' initial decision not to file charges. *See id.* Similarly, a male TSO at New York's LaGuardia Airport told a 21-year-old woman he needed to screen "[her] body and [her] luggage," led her into a bathroom, and sexually assaulted her. Ray Sanchez, *New York TSA Worker Accused of Sexually Abusing Passenger*, CNN (Aug. 29, 2015, 7:29 AM), https://www.cnn.com/2015/08/28/us/new-york-tsa-screener-charged/index.html (internal quotation marks omitted). These types of abuses are more likely to occur in the context of TSA screenings, making them vastly dissimilar to regulatory searches confined to discrete items or facilities.

While Pellegrino did not bring any assault or battery claims, the majority's holding would bar other plaintiffs from bringing those claims, leaving them without a remedy.[20]

---

[20] Under the Westfall Act, 28 U.S.C. § 2679(d), the Government may deny that an employee was acting within the scope of her employment and thus allow a plaintiff to

Their holding would also immunize TSOs that retaliate against passengers who demand better screening conditions or voice concerns over screening procedures. This cannot be what Congress intended in passing § 2680(h), which it characterized as "a minimal first step in providing a remedy against the Federal Government" for certain abuses. S. Rep. No. 93-588, at 2792 (1973). Nor is it faithful to statutory text that spells out a specific definition of "investigative or law enforcement officer" and nowhere limits itself to criminal law enforcement personnel.

Accordingly, TSA searches are not the same as administrative inspections, and, by equating these concepts, today's holding denies recourse to those who are harmed by TSO abuses.

## V.    Conclusion

Pellegrino brings us an issue of first impression. She asks if she can recover against the TSOs who detained her and ordered her arrest at Philadelphia International Airport. Her specific claims—false arrest, false imprisonment, and malicious prosecution—fall within the Federal Tort Claims Act. While it ordinarily bars intentional tort claims against Government officials, it contains a proviso that would allow her claims to go forward if TSOs are "investigative or law enforcement officers." They are so if they are "officer[s] of

---

proceed against the employee in state court, *see Armstrong v. Thompson*, 759 F. Supp. 2d 89, 96 (D.D.C. 2011) (calling this a "denial of a Westfall certification"). The Government's decision to deny Westfall certification is largely within its discretion. *See* Corrected Tr. of Oral Arg. at 30:16–22. Neither the Government nor the District Court denied Westfall certification to the TSOs in this appeal.

the United States . . . empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). TSOs fit this definition because they conduct searches, *see* 49 C.F.R. § 1546.207(a), and have the legal authority to do so, *see* 49 U.S.C. § 44901(a). They are also "officers of the United States," as they are tasked with administering and maintaining the law, *see* 49 C.F.R. §§ 172.101, 175.10(a), and are given the exclusive authority to conduct pre-boarding screenings for "flights . . . originating in the United States," 49 U.S.C. § 44901(a). Thus they fall within the ambit of the proviso, and Pellegrino's claims should proceed to trial.

Yet my colleagues hold that they are not covered. They look to other statutes for clarification, consult various canons of construction, and also examine legislative history. Ultimately they conclude § 2680(h) covers only criminal law enforcement officers. In doing so, they depart from other Circuits' interpretation of the proviso. *See Bunch*, 880 F.3d at 943-45; *Sami*, 617 F.2d at 764-65. They also disregard Supreme Court precedent that tells us how to interpret § 2680(h)'s language. *See Millbrook*, 569 U.S. at 56-57. Their decision insulates TSOs from all intentional tort claims, leaving plaintiffs without a civil remedy. Absent congressional action, they cannot recover if a TSO assaults them, unlawfully detains them, or unlawfully lodges a criminal complaint against them. All of this is because my colleagues look through a lens that legislates "criminal" into a provision it nowhere appears.

This is not what Congress intended, as it enacted § 2680(h) to serve as a broad remedy against tortious conduct. *See* S. Rep. No. 93-588, at 2791 (1973) (noting the provision "would submit the Government to liability whenever its agents act under color of law so as to injure the public through search and seizures that are conducted without

57

warrants"). It also ignores Congress's definition of "investigative or law enforcement officer," which we must apply "even if it varies from that term's ordinary meaning." *Stenberg*, 530 U.S. at 942.

In view of these principles, I disagree with my colleagues' reasoning. Instead of relying on non-textual sources, we must apply § 2680(h)'s plain language; other statutes, the canons, and legislative history (*i.e.*, authorities outside of the proviso) cannot defeat its words. Because the text tells the tale, I part with today's holding. I conclude that TSOs are investigative or law enforcement officers under § 2680(h) and that TSA searches do not evade its reach. In line with my conclusion, Pellegrino (and similarly situated plaintiffs) are entitled to their day in court. I respectfully dissent.